Ivan A. ANIXTER; Blanche Dickenson; Dolly K. Yoshida, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

v.

HOME–STAKE PRODUCTION COMPANY, an Oklahoma corporation; Home–Stake 1971 Program Operating Corporation; Home–Stake 1970 Program Operating Corporation; Home–Stake 1969 Program Operating Corporation; Home–Stake 1968 Program Operating Corporation; Home–Stake 1967 Program Operating Corporation; Home–Stake 1966 Program Operating Corporation; Home–Stake 1965 Program Operating Corporation; Robert S. Trippet; E.M. Kunkel; Thomas A. Landrith; J.D. Metcalfe; H.B. Gutelius; H.L. Fitzgerald, Defendants,

and

Wynema Anna Cross, Executrix of the Estate of Norman C. Cross, Jr., Defendant–Appellant.

A.M. ANDERSON; Bank of America National Trust and Savings Association, as Trustee for Merl McHenry, Joseph A. Buda, Arthur Bueche, George V.T. and Helen Burgess; Dewey J. Cali; William H. Colquhoun; S.W. Corbin; Robert B. Coburn; Vigil B. Day; William H. Dennler; Mario Dimartino; Stella Dimartino; John M. Evans; Margaret C. Everett; Isador H. Finkelstein; Joseph H. Gauss; H.W. Gouldthorpe; Ralph Hart; James J. Hayes; Earl D. Hilburn; Joseph E. Horak; Gerald A. Hoyt; Richard M. Hurst; Ralph Iannucci; Emily Iannucci; Milton F. Kent; Howard Kicherer; Elizabeth Kicherer; John Kokoszka; Millie B. Lassing; Joseph Levin; Marie F. Levin; John D. Lockton; Dennis G. Lyons; Ferdinand F. McAllister; Russell W. McFall; James Madden; Albert Manganelli; Nicholas A. Marchese; Stanley A. Marks; John G. Martin; C.W. Moeller; Andrew Overby; Carl E. Palermo; Frank A. Palermo; Roy T. Parker, Jr.; Bruce M. Robertson;

D.D. Scarff; M.L. Scarff; A.E. Schubert; William R. Smart; E. Starr; Janet G. Stewart; Gerald Toomey; Paul Townsend; Vernon Underwood; H.B. Waldron, Jr.; Ted B. Westfall, Plaintiffs–Appellees,

v.

HOME–STAKE PRODUCTION COMPANY, an Oklahoma corporation; Home–Stake 1970 Program Operating Corporation, a Delaware corporation; Robert S. Trippet; Harry Heller; Simpson Thacher and Bartlett, a partnership; Thomas A. Landrith, Jr.; E.M. Kunkel; McAfee, Taft, Mark, Bond, Rucks, and Woodruff, a professional corporation and its professional employees and attorneys and partners, their successors and assigns, Defendants,

and

Wynema Anna Cross, Executrix of the Estate of Norman C. Cross, Jr., Defendant–Appellant.

A.M. ANDERSON; Richard J. Anton; Bank of America National Trust and Savings Association, as Trustee for Merl McHenry, E.P. Bernuth, Sophie K. Bernuth, Joseph A. Buda, George and Helen Burgess; Dewey Cali; Robert B. Coburn; Coburn & Libby, Inc.; Edward V. Coonan; S.W. Corbin; William H. Dennler; Mario Dimartino; Stella Dimartino; John Evans; Margaret C. Everett; L.L. Ferguson; Isador H. Finkelstein; H.W. Gouldthorpe; George L. Haller; Jack Hanson; Ralph Hart; F.H. Holt; Joseph E. Horak; Gerald A. Hoyt; Howard G. Kicherer; Elizabeth C. Kicherer; John Kokoszka; Millie B. Lassing; Joseph Levin; Marie Levin; John D. Lockton; D.W. Lynch; D.B. Lynch; Dennis G. Lyons; Ferdinand F. McAllister; Russell McFall; James F. Madden; Albert Manganelli; Nicholas Marchese; Stanley A. Marks; C.W. Moeller; William H. Mortensen; Carl Olson; Patricia Olson; Carl Palermo; Frank Palermo; Roy T. Parker; Helen M. Reeder; D.D. Scarff; M.L. Scarff; Richard Scott; Louis P.

Singer; William R. Smart; J. Stanford Smith; G. Curtis Stewart; Paul Townsend; Vernon Underwood; Ted B. Westfall; J. Howard Wood; Sidney Woolwich; Murray Zimmerman, Plaintiffs–Appellees,

v.

HOME–STAKE PRODUCTION COMPANY, an Oklahoma corporation; Home–Stake 1969 Program Operating Corporation, a Delaware corporation; Robert S. Trippet; E.M. Kunkel; Thomas A. Landrith, Jr.; Harry Heller; William Blum; Simpson Thacher and Bartlett; William D. Lewis; Richard A. Ganong; Lewis & Ganong, a partnership, Defendants,

and

Wynema Anna Cross, Executrix of the Estate of Norman C. Cross, Jr., Defendant–Appellant.

No. 95–5086.

United States Court of Appeals, Tenth Circuit.

Jan. 29, 1996.

B. Hayden Crawford (Robert L. Bainbridge and Kyle B. Haskins with him on the briefs), of Crawford, Crowe, Bainbridge & Haskins, P.A., Tulsa, Oklahoma, for Defendant–Appellant.

Elihu Inselbuch, of Caplin & Drysdale, Chartered, New York City (Peter Van N. Lockwood, of Caplin & Drysdale, Chartered, New York City, William H. Hinkle, of Hinkle, Zeringue & Smith, Tulsa, Oklahoma, and William A. Wineberg and Michael R. Simmonds, of Wineberg, Simmonds & Narita, San Francisco, California with him on the briefs), for Plaintiff–Appellee.

Before BALDOCK, BRORBY and LUCERO, Circuit Judges.

LUCERO, Circuit Judge.

More than thirty years ago, Home–Stake Production Company began offering securities registered with the Securities Exchange Commission ("SEC") in the form of interests in oil and gas drilling programs. The securities represented units of participation in annual oil production subsidiaries Home–Stake established each year between 1964 and 1972, referred to as Program Operating Corporations ("Programs"). These offerings purported to present investors both the promise of return on investment and attractive tax deductions of intangible drilling costs. In fact, we are told, the Home–Stake venture resembled a classic Ponzi swindle. Instead of going to oil development, investments made in later-year Programs were paid to earlier-year investors as "income" from oil production. Inevitably, the scheme collapsed, but only after investors had lost tens of millions of dollars. This securities fraud case, first filed in 1973, already has been the subject of four published opinions by this court. Over the past four years it has been ordered dismissed, reinstated, remanded, and now, appealed once more.

In this appeal we must resolve whether again to dismiss or remand judgments against Home–Stake's outside auditor for violating § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the SEC, 17 C.F.R. § 240.10b–5. Appellant, Wynema Anna Cross, executrix of the estate of Norman C. Cross, Jr., raises several issues on appeal. The question dominating our review is whether we can let stand a general jury verdict returned on a securities fraud claim that included an instruction on aiding and abetting liability, an implied cause of action that has since been found invalid by the Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In the balance is a choice between vacating a jury award plaintiffs won on claims filed more than twenty-two years ago, and maintaining judgments now totalling more than $40 million when the jury may have found liability on an invalid legal theory. We conclude that

the aiding and abetting instruction hopelessly taints the general verdict and that remand for a new trial is necessary.

## I. BACKGROUND

In March 1973, Ivan A. Anixter, along with others, filed a lawsuit in the Northern District of California alleging violations of federal securities laws. Defendants included primary officers and directors of Home–Stake, its outside auditors and attorneys, and certain broker-dealers who marketed its securities. This case, along with other individual actions against Home–Stake, was transferred and consolidated in the Northern District of Oklahoma. In 1977, the district court certified nine separate plaintiff classes, one for investors in each of the annual Programs.[1] The case went to trial in 1988. Plaintiffs from all nine classes and individually consolidated actions won jury verdicts against defendants totalling approximately $130 million. Because of settlements between the parties, only claims from the 1969 and 1970 Programs remain against the appellant, who was substituted for Cross upon his death in 1985. Appellees are the class representatives of the plaintiff investors in Home–Stake Programs.

### A. Issues at Trial and the Jury Verdict

Because the primary issue in this appeal involves Cross's direct liability to appellees, we focus on the relevant facts concerning his involvement in the Home–Stake enterprise and allegations made regarding his direct participation in the alleged fraud. Against Cross, plaintiffs alleged primary violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the SEC, aiding and abetting primary violations of Section 10(b) and Rule 10b–5, and liability under Section 11 of the Securities Act of 1933. Our

analysis requires some extended recitation of facts.

Home–Stake was an affiliate to the annual Programs and possessed the contractual rights to a percentage of the Programs' revenue in return for developing and recovering oil reserves, the rights to which were owned by the Programs. Investors bought interests in the Programs, not Home–Stake itself. Plaintiffs alleged that the materials used to sell interests in the Programs contained many untrue and misleading statements, as well as omissions of material fact. In particular, plaintiffs alleged that despite rosy reports and projections in materials disseminated to potential investors, very little oil was actually being produced by Home–Stake and its subsidiaries, and that large "royalty" payments paid out to early investors in fact came not from oil production but from other investors.[2]

Cross's 10b–5 liability rested on his alleged participation in the preparation and filing of the registration statements, program books, and prospectuses, and especially his certifications and opinion letters verifying Home–Stake's overall health, made with knowledge of the false statements contained therein, or with reckless disregard as to the truth or falsity of the statements. Specifically, plaintiffs alleged that Cross's behavior "constitutes participation in or an aiding and abetting of the material misstatements, omissions and fraudulent course of conduct or fraudulent scheme engaged in" by other defendants, principally the top officers and directors of Home–Stake. Thus, plaintiffs brought both primary and aiding and abetting securities fraud claims against Cross.

Much of Cross's participation is not in serious dispute. Home–Stake retained Cross as its independent auditor for 1968–1971. Cross prepared documents used by

---

1. *In re Home–Stake Prod. Co. Sec. Litig.*, 76 F.R.D. 351, 376 (N.D.Okla.1977).

2. One of the aspects of the alleged scheme was the allocation of "production revenue" or "pro rev" among investors in the different Programs. According to evidence presented at trial, Home–Stake's top officers, with the knowledge of Cross, would make different distributions of pro rev to like investors, depending on how likely the investor would be to make additional investments in

Home–Stake's Programs, and the chances that the investor would become disgruntled without pro rev distributions. Other alleged fraudulent acts by Home–Stake included failure to develop reserves, inflating value of assets, and overselling of units in the 1969 and 1970 Programs. Apparently, none of this was discussed in the prospectuses or Program Books, creating a false and misleading impression of the investment.

Home–Stake, consented to have his name appear in registration statements filed with the SEC, and certified certain financial materials disseminated by Home–Stake. Relevant to claims made by investors in the 1969 and 1970 Program, Cross prepared Home–Stake's consolidated financial statements for 1968 and 1969. He also prepared the beginning (or "start-up") balance sheets for the 1969 and 1970 Programs, which were included, respectively, in the 1969 and 1970 Program registration statements and prospectuses.[3] The registration statements and attached prospectuses were filed with the SEC. Cross consented to the use of his report on the 1969 and 1970 Program balance sheets in the SEC filings.

Cross also provided Home–Stake with opinions on the 1969 and 1970 Programs' beginning balance sheet he prepared.[4] These opinions were also contained in the registration statements and prospectuses filed with the SEC. Cross also provided opinion letters for Home–Stake's consolidated financial statements for 1968–1970. The opinion letters for Home–Stake's financial statements, addressed to the Home–Stake board of directors, were included in Home–Stake's 1969 and 1970 annual reports but were not included in the Program prospectuses or registration statements.

In 1969 and 1970, Home–Stake also published and mailed to Program participants documents known as "Program Books" or "Black Books." These documents, which included descriptions of specific oil recovery programs, estimates of anticipated returns, etc., were not registered with the SEC and contained information inconsistent with or contradicting the prospectuses. Home–Stake's financial statements, audited by Cross, allegedly also were included either with the Program Books or as part of Home–Stake's "sales kit." Allegedly, the Program Books and sales kits were the primary methods of marketing Program units; the SEC-filed prospectuses were made available to investors only upon request.

Finally, Cross was also involved in the prospectus for a rescission offer made to investors in the 1970 Program. In 1971, the SEC filed a complaint against Home–Stake in federal district court, alleging that its officers and directors failed to meet information requirements to investors and misstated the use of investments in the 1970 Program. As part of a consent decree entered into with the SEC, Home–Stake made a rescission offer to its 1970 Program investors. The offer documents included a Rescission Offer Prospectus. Plaintiffs alleged that the Rescission Offer Prospectus itself failed to disclose material facts. Cross prepared an opinion on Home–Stake's 1970 consolidated financial statement and an opinion on the beginning balance sheet of the 1970 Program, included as part of the 1970 Rescission Offer Registration Statement.[5]

3. The one-page "start-up" balance sheet for the 1969 Program indicates only that at its inception the Program had $100,000 in assets. A note at the bottom of the balance sheet states that the Program planned on offering $12.02 million worth of participating interests to prospective investors, and that, "[r]eference should be made elsewhere in the Prospectus for details of the Offering and the oil and gas secondary development program and for information concerning an affiliated interest (Home–Stake Production Company) which will assist in carrying out the Program." The same notation appears in the start-up balance sheet for the 1970 Program.

4. For example, the prospectus for the Home–Stake 1969 Program contained the following "Auditor's Report" following the balance sheet:
TO: HOME–STAKE 1969 PROGRAM OPERATING CORPORATION
We have examined the balance sheet of HOME–STAKE 1969 PROGRAM OPERATING CORPORATION (a Delaware corporation and a wholly-owned subsidiary of Home–Stake Production Company) as of March 10, 1969. Our examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.
In our opinion, the accompanying balance sheet presents fairly the financial position of Home–Stake 1969 Program Operating Corporation as of March 10, 1969, in conformity with generally accepted accounting principles.
NORMAN C. CROSS, Jr.
Certified Public Accountant

5. The 1970 financial statement included in the Rescission Offer Prospectus differed from the one dated three months later in Home–Stake's 1970 Annual Report. The latter version noted that, unlike previous years, Home–Stake's petroleum engineers did not provide assurances that revenues from future oil development for the 1970 Program would be realized. Through a

After a three week trial on the issue of defendants' liability, the district court instructed the jury on both Rule 10b–5 liability and "aiding and abetting a violation of 10b–5." The jury returned verdicts for the 1969 and 1970 Program classes against Cross. The court ultimately entered judgments against appellant and the other defendants in the amount of about $10.8 million for Rule 10b–5 violations. On a case that was approaching the age of majority, another $36 million in prejudgment interest was awarded for these 10b–5 judgments.

## B. Proceedings After Trial

Since the jury verdicts in 1988 and 1989, this case has been affected by four Supreme Court cases. While the district court judgment was on appeal, the Supreme Court, in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 359, 111 S.Ct. 2773, 2780, 115 L.Ed.2d 321 (1991), held that a federal, not state, limitations period applies to § 10(b) claims, and applied the new rule to the *Lampf* plaintiffs. The same day the Court also decided *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 544, 111 S.Ct. 2439, 2448, 115 L.Ed.2d 481 (1991), which clarified the retroactive effect of Supreme Court decisions on pending cases, holding that when the Court applies a rule of law to litigants in the case before it, the rule applies "with respect to all others not barred by procedural requirements or res judicata." Based on these two cases, the Tenth Circuit ordered plaintiffs' claims dismissed, *Anixter v. Home–Stake Prod. Co.*, 939 F.2d 1420 (10th Cir.1991) (*Anixter I* ), and reaffirmed this mandate on rehearing in *Anixter v. Home–Stake Prod. Co.*, 947 F.2d 897 (10th

Cir.1991) (*Anixter II* ). In December 1991 Congress enacted legislation which ordered courts to apply to pre-*Lampf* § 10(b) claims the limitations period applicable in the appropriate jurisdiction prior to *Lampf*, and which allowed plaintiffs to reinstate claims that were dismissed as time barred under *Lampf* if they would have been timely under the pre-*Lampf* limitations period.[6] Section 27A of the Securities Exchange Act of 1934 (§ 476 of the Federal Deposit Insurance Corporation Improvement Act of 1991) (codified as 15 U.S.C. § 78aa–1 (1988 ed., Supp. V)). Pursuant to § 27A, plaintiffs moved to reinstate their § 10(b) claims and to vacate the mandate in *Anixter II*. While those motions were pending, the Supreme Court, on consideration of *Anixter II*, vacated our judgment and remanded for reconsideration in light of § 27A. *Dennler v. Trippet*, 503 U.S. 978, 112 S.Ct. 1658, 118 L.Ed.2d 382 (1992) (mem.). On remand this court upheld § 27A's constitutionality as applied to this case, and reinstated plaintiffs' § 10(b) claims, *Anixter v. Home–Stake Prod. Co.*, 977 F.2d 1533, 1547 (10th Cir.1992) (*Anixter III* ), and, in a separate opinion, upheld the damages award and remanded the case for a redetermination of prejudgment interest, *Anixter v. Home–Stake Prod. Co.*, 977 F.2d 1549, 1553–55 (10th Cir.1992) (*Anixter IV* ), cert. denied, 507 U.S. 1029, 113 S.Ct. 1841, 123 L.Ed.2d 467 (1993).

As the only remaining nonsettling defendant, appellant, as executrix of the Cross estate, unsuccessfully contested an award of prejudgment interest to plaintiffs in the 1969 and 1970 Program classes. While the district court was considering postjudgment motions, the Supreme Court decided *Central*

---

fairly complex accounting maneuver, Home–Stake treated these future receivables as present revenues of the company. The financial statement included in the Rescission Offer Prospectus did not note the absence of assurances for the 1970 Program.

At trial, plaintiffs argued that Cross should have given a qualified opinion on Home–Stake's 1970 consolidated financial statement, in part because of this omission.

6. Section 27A provides:

(a) *Effect on pending causes of action*
The limitations period for any private civil action implied under [§ 10(b)] that was commenced on or before June 19, 1991, shall be

the limitation period provided by the laws applicable in the jurisdiction ...

(b) *Effect on dismissed causes of action*
Any private civil action implied under [§ 10(b)] that was commenced on or before June 19, 1991—
(1) which was dismissed as time barred subsequent to June 19, 1991, and
(2) which would have been timely filed under [the applicable limitations period in the jurisdiction as existed on June 19, 1991],
shall be reinstated on motion by the plaintiff not later than 60 days after December 19, 1991.
15 U.S.C. § 78aa–1.

*Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, ——, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994), which holds that no aiding and abetting liability can be implied under § 10(b). Based on this case, appellant moved for dismissal or, alternatively, for a new trial, arguing that Cross was not a primary violator of § 10(b), and that his reckless behavior could not subject him to § 10(b) liability. The trial court denied the motion and the judgment was appealed to this court. Five days after filing the notice of appeal, the Supreme Court decided *Plaut v. Spendthrift Farm, Inc.,* —— U.S. ——, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), which held part of § 27A unconstitutional to the extent it ordered the judiciary to reopen cases dismissed under *Lampf.*

## II. DISCUSSION

Appellant raises four separate issues. First, the case was improperly reinstated under § 27A(b), a provision that was deemed unconstitutional in *Plaut.* Thus the case should be considered dismissed and the appeal moot. Second, the claims against Cross should be dismissed because his actions do not constitute a primary violation of Rule 10b–5, and the Supreme Court's decision in *Central Bank of Denver* precludes private implied actions for aiding and abetting such violations. Alternatively, appellant argues that a new trial is necessary to determine Cross's liability for a primary violation because the jury verdict against Cross was ambiguous and did not distinguish between aiding and abetting and primary § 10(b) violations. Third, appellant argues that Cross did not possess the proper state of mind for a primary violation of Section 10(b). Fourth, appellant challenges the propriety of the district court's prejudgment interest award.

### A. Does *Plaut* Require Dismissal?

■ In *Anixter III,* this court reinstated the claims that had been dismissed as time-barred under *Lampf. Anixter III,* 977 F.2d at 1547. Appellant argues that the Supreme Court's recent decision in *Plaut* requires dismissal of those claims once again. Although this argument was not raised below, inasmuch as *Plaut* was decided after appellant

filed her notice of appeal, we may consider changes in governing law arising during the pendency of the appeal. *See, e.g., United States v. Novey,* 922 F.2d 624, 629 (10th Cir.1991).

In *Plaut,* the Supreme Court considered the constitutionality of § 27A(b). That subsection requires reinstatement, upon timely motion, of any case *dismissed* as time barred under *Lampf,* if the case was filed before *Lampf* and if it would have been timely under the limitation period that applied in the relevant jurisdiction prior to *Lampf.* § 27A(b). *Plaut* holds that § 27A(b) violates the constitutional separation of powers doctrine "to the extent that it requires federal courts to reopen final judgments entered before its enactment." *Plaut,* —— U.S. ——, 115 S.Ct. at 1463. When retroactive legislation, such as § 27A, "requires its own application in a case already finally adjudicated, it does no more and no less than 'reverse a determination once made, in a particular case.'" *Id.* at ——, 115 S.Ct. at 1456 (quoting The Federalist No. 81, p. 545·(J. Cooke ed. 1961)). Under the structure of Article III, which establishes "one supreme Court" and "inferior Courts," the decision of an inferior court is only the final word of the judicial department once the time for appeal has expired. *Id.* at ——, 115 S.Ct. at 1457. Once a judicial decision becomes final, "Congress may not declare by retroactive legislation that the law applicable to the very case was something other than what the courts said it was." *Id.*

Appellant argues that *Plaut* requires dismissal of any case reinstated under § 27A(b). Further, appellant insists that this case was reinstated under § 27A(b). Appellees, on the other hand, dispute that this case·was reinstated under § 27A(b), because the district court never acted on our mandate to dismiss this case. In appellees' view, this case became automatically reinstated under § 27A(a), which applies to "pending" cases. Alternatively, appellees argue that even if this case was dismissed and subsequently reinstated under § 27A(b), *Plaut* does not affect this case.

■ It is not necessary for us to decide whether this case had been "dismissed" with-

in the meaning of § 27A(b) when § 27A was enacted. Even if we assume this case was dismissed and thereafter reinstated under § 27A(b), we cannot accept appellant's argument that *Plaut* requires dismissal of all cases reinstated under § 27A(b). The term "dismissed causes of action" under § 27A(b) arguably includes dismissed cases that are still pending on appeal, and finally dismissed cases that have completed their journey through the federal courts. *See Plaut,* —— U.S. at ——, 115 S.Ct. at 1452 (recognizing distinction); *Durning v. Citibank, Intern.,* 990 F.2d 1133, 1137–38 (9th Cir.1993) (same). *Plaut* invalidates § 27A(b) only "to the extent that it requires federal courts to reopen *final* judgments entered before its enactment." *Plaut,* —— U.S. at ——, 115 S.Ct. at 1463 (emphasis added).

This court did not reopen a final judgment when it reinstated plaintiff's claims, as we recognized in *Johnston v. Cigna Corp.,* 14 F.3d 486, 489 (10th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 1792, 131 L.Ed.2d 720 (1995). In *Johnston,* we distinguished *Anixter* from a final case that had already made its way through the courts. We noted that "[f]or purposes of retroactive legislation, a case is final only after the availability of appeal is exhausted, and the time for a petition for certiorari has elapsed or the petition has been denied. Because the *Anixter* plaintiffs' petition for certiorari was before the Supreme Court at the time section 27A was enacted, the case had not completed its journey through the appellate process and was therefore not final." *Id.* at 489 n. 4 (citations omitted). We conclude that *Plaut* does not apply to this case because reinstatement of the claims at issue did not operate to reopen a final judgment. *Cf. Axel Johnson Inc. v. Arthur Andersen & Co.,* 6 F.3d 78, 83–85 (2d Cir.1993) (finding no separation of powers violation from reinstatement under 27A(b) of dismissed case still subject to appeal).

### B. Cross's Liability under Section 10(b)

Appellant challenges the sufficiency of the evidence finding Cross liable for violating § 10(b). According to appellant, the jury could only have found Cross to be an aider and abettor in the Home–Stake fraud. Because the Supreme Court recently eliminated aiding and abetting liability as an implied private cause of action, appellant urges us to reverse the judgment. In the alternative, appellant argues that the jury's verdict was tainted because it was improvidently instructed that 10b–5 liability could be found for aiding and abetting another's securities fraud violation. We must first consider what acts make up a "primary" violation of § 10(b), and how they differ from those that could be characterized only as "aiding and abetting."

### 1. Primary Violations under Section 10(b)

■ Together, the 1933 Securities Act and the 1934 Securities Exchange Act " 'embrace a fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of *caveat emptor.*' " *Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1445 (quoting *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972)). Section 10(b) is the general antifraud provision of the 1934 Act. *Id.* It states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

> . . . . .

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe....

15 U.S.C. § 78j. In its parallel regulation, Rule 10b–5, the SEC frames the prohibition similarly:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made; in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. In deciding whether conduct violates Rule 10b–5, "we turn first to the language of § 10(b)" because "the starting point in every case involving construction of a statute is the language of the statute itself." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382–83, 47 L.Ed.2d 668 (1976) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). To the extent Rule 10b–5 could be read more broadly than § 10(b), the text of the statute controls. *See Central Bank of Denver*, —— U.S. at ——, 114 S.Ct. at 1446.

In *Central Bank of Denver*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court concluded that § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Id.* at ——, 114 S.Ct. at 1448. By adopting this interpretation of the statute, the Court specifically eliminated private actions predicated on aiding or abetting those who engage in the prohibited conduct. *Id.* at ——, 114 S.Ct. at 1455.[7] Recognizing the potentially sweeping effect of its holding on what had been settled securities law, the Court made clear its focus:

The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met.

*Id.* (emphasis in original).

Here, we must determine whether Cross himself committed a violation of § 10(b) and Rule 10b–5, or whether the sum of his conduct only amounted to aiding and abetting others in their violations. Unfortunately, deciding when conduct constituting aiding and abetting rises to the level of prohibited primary conduct is not well settled.[8] Appellant and appellees both rely on *Central Bank of Denver* to illuminate the distinctions. Appellant believes that the case demonstrates Cross's acts and his peripheral position in the fraud are not behavior of the type that give rise to § 10(b) liability; appellees read the case as reinforcing their view that accountants who make or certify material misstatements are still subject to liability.

In *Central Bank of Denver*, the defendant bank was the indenture trustee for $26 million in bonds issued by a public building authority. The bonds were secured by landowner assessment liens. According to the bond covenants, the land subject to the liens had to be worth at least 160% of the bonds' outstanding principal and interest. The covenants also required the developer to provide the bank with evidence that the proper ratio was met. The bank learned of a decline in

---

**7.** The Court applied its holding to the parties before it; therefore, aiding and abetting a § 10(b) violation cannot be the basis of liability in private actions still before the courts. *See James B. Beam Distilling Co.*, 501 U.S. at 544, 111 S.Ct. at 2448.

**8.** Commentators have long recognized vagaries in the borders between primary and secondary liability. *See generally* Daniel R. Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934*, 69 Cal.L.Rev. 80, 103–111 (1981); David S. Ruder, *Multiple Defendants in Securities*

*Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution*, 120 U.Pa.L.Rev. 597, 600 (1972); Ben D. Orlanski, Comment, *Whose Representations Are These Anyway? Attorney Prospectus Liability After Central Bank*, 42 U.C.L.A.L.Rev. 885, 895–96 (1995); Timothy M. Metzger, Comment, *Abandoning Accountants' Liability for Aiding and Abetting 10b–5 Securities Fraud*, 87 Nw.U.L.Rev. 1374, 1390 (1993). *Central Bank of Denver* requires courts to delineate primary liability much more clearly.

value of the property securing the bonds, and that the developer's assurances were suspect. Nevertheless, the bank went along with the developer and postponed an independent review of the developer's appraisal until after the new bonds were issued. The bonds were issued, the building authority defaulted on them, and bond purchasers sued the bank as an aider and abettor of the fraud perpetrated by the building authority, the underwriter and the developer. *Id.* at ——, 114 S.Ct. at 1443.

The Supreme Court ruled that the bank could not be held liable as an aider and abettor under § 10(b). "[T]he text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation.... [T]he statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Id.* at ——, 114 S.Ct. at 1448. Despite the language of § 10(b) prohibiting one from "directly or indirectly" employing a deceptive device, "[t]he proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Id.* Underscoring the Court's conclusion is the recognition that aiding and abetting behavior could establish liability without demonstrating reliance by plaintiff on the aider and abettor's acts. *Id.* at ——, 114 S.Ct. at 1449. Liability without reliance was previously rejected in *Basic, Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988). *Central Bank of Denver,* —— U.S. at —— - ——, 114 S.Ct. at 1449-50.

As recited previously, allegations against Cross were based both on his assistance in preparing parts of prospectuses Home–Stake distributed to potential investors and certifications and opinion letters regarding some of Home–Stake's and its Programs financial data (some of which were filed with the SEC), as well as opinions he prepared on Home–Stake's consolidated financial statements. The parties disagree about whether Cross's acts were primary or aiding and abetting violations. Appellant argues that none of Cross's acts constituted fraudulent misrepresentations or omissions relied on by investing plaintiffs; at most the acts only aided Home–Stake in committing the alleged fraud. Appellees point to Cross's certifications and opinion letters as evidence that he himself made misrepresentations or omissions sufficient to subject him to primary liability.[9]

■ To establish a primary liability claim under § 10(b), a plaintiff must prove the following facts: (1) that the defendant made an untrue statement of material fact, or failed to state a material fact; (2) that the conduct occurred in connection with the purchase or sale of a security; (3) that the defendant made the statement or omission with scienter; and (4) that plaintiff relied on the misrepresentation, and sustained damages as a proximate result of the misrepresentation. *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986 (10th Cir.1992). This contrasts with aider and abettor liability, which required plaintiff to prove (1) the existence of a primary violation of the securities laws by another; (2) knowledge of the primary violation by alleged aider and abettor; and (3) substantial assistance by the alleged aider and abettor in achieving the primary violation. *Id.* The critical element separating primary from aiding and abetting violations is the existence of a representation, either by statement or omission, made by the defendant, that is relied upon by the plaintiff. Reliance only on representations made by others cannot itself form the basis of liability. *See Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1448.

■ Clearly, accountants may make representations in their role as auditor to a firm selling securities. *See, e.g., Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (defendant accountant found primarily liable for violating § 10(b) based on representations made in

**9.** Section 10(b) proscribes both "manipulative" and "deceptive" practices in the sale of a security. Because, however, the term "manipulation" is "virtually a term of art" in the securities fraud context (involving wash sales, rigged prices, and other practices intended to mislead investors), and has little application with respect to the role of auditors, our focus is on the term "deception," or "misrepresentation." *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977).

registration statements filed with the SEC). Typical representations include certifications of financial statements and opinion letters. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 628 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). An accountant's false and misleading representations in connection with the purchase or sale of any security, if made with the proper state of mind and if relied upon by those purchasing or selling a security, can constitute a primary violation. *Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1455; *see also Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 189–90 (7th Cir.1993); *Akin v. Q–L Invs., Inc.,* 959 F.2d 521, 526–27 (5th Cir. 1992); *Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27, 34–35 (D.C.Cir.1987); *Fischel, supra,* at 107–08.[10] There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach. *SEC v. Holschuh,* 694 F.2d 130, 142 (7th Cir.1982) ("actual or first-hand contact with offerees or buyers [is not] a condition precedent to primary liability for antifraud violations"). Nevertheless, for an accountant's misrepresentation to be actionable as a primary violation, there must be a showing that he knew or should have known that his representation would be communicated to investors because § 10(b) and Rule 10b–5 focus on fraud made "in connection with the sale or purchase" of a security. *Frymire–Brinati,* 2 F.3d at 189–90; *Akin,* 959 F.2d at 526–27; *Zoelsch,* 824 F.2d at 34–35.[11]

■ Reading the language of § 10(b) and 10b–5 through the lens of *Central Bank of Denver,* we conclude that in order for accountants to "use or employ" a "deception" actionable under the antifraud law, they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors.[12] In ad-

10. Some post-*Central Bank of Denver* cases have held that third party defendants can be liable for statements made by others, where the defendant substantially participated in preparing the statements. *See, e.g., In re Software Toolworks, Inc.,* 50 F.3d 615, 628 n. 3 (9th Cir.1994) (accountant may be primarily liable based on "significant role" in drafting letter client sent to SEC), *cert. denied,* —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995); *In re ZZZZ Best Sec. Litig.,* 864 F.Supp. 960, 970 (C.D.Cal.1994) (accounting firm that was "intricately involved" in creating false documents published by client is a primary violator); *Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 432–34 (N.D.Ill.1995) (primary liability attaches where accountant charged with playing a "central role in the drafting and formation of the alleged misstatements" that were incorporated into prospectus). To the extent these cases allow liability to attach without requiring a representation to be made by defendant, and reformulate the "substantial assistance" element of aiding and abetting liability into primary liability, they do not comport with *Central Bank of Denver.*

11. In the wake of *Central Bank of Denver* a number of district courts have outlined the type of behavior that is now insufficient to subject a peripheral party to liability under 10b–5. *See, e.g., In re Kendall Square Research Corp. Sec. Litig.,* 868 F.Supp. 26, 28 (D.Mass.1994) (accountant's review and approval of misleading financial statements cannot itself rise to a 10b–5 violation); *Vosgerichian v. Commodore Int'l,* 862 F.Supp. 1371, 1378 (E.D.Pa.1994) (allegations regarding accountant who "advised" and gave guidance to client who made an allegedly fraudu-

lent misrepresentation is insufficient for § 10(b) liability).

12. The extent to which an accountant can be liable under § 10(b) for omissions is not settled. "'When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.'" *Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1447 (quoting *Chiarella v. United States,* 445 U.S. 222, 234–35, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980)). In *Windon Third Oil & Gas Drilling Partnership v. FDIC,* 805 F.2d 342 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), we found that a duty to disclose only arises "'because of a fiduciary or other similar relation of trust and confidence between [parties].'" ... Without a duty to disclose, silence cannot be made fraudulent." *Id.* at 347 (quoting *Chiarella,* 445 U.S. at 228, 100 S.Ct. at 1114–15). Other courts have determined that accountants may have a special duty to disclose "when they make affirmative statements on which they know the investors will rely." *See Akin,* 959 F.2d at 531–32 (collecting cases). This circuit has not decided whether an accountant's auditing report of a public company's financial statement by itself creates a fiduciary relationship. *Cf. Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043–44 (11th Cir.1986) (when a public auditing firm gives an opinion or certifies statements it assumes a role carrying a relationship of trust with the public), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); *United States v. Arthur Young & Co.,* 465 U.S. 805, 817–18, 104 S.Ct. 1495, 1503–04, 79 L.Ed.2d 826 (1984) (an accountant who audits the financial statement of

dition to being consistent with the language of the statute, this rule, though far from a bright line, provides more guidance to litigants than a rule allowing liability to attach to an accountant or other outside professional who provided "significant" or "substantial" assistance to the representations of others. *See Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1454 (certainty and predictability are crucial to securities markets).

 The record in this case contains much evidence that could sustain a finding of primary liability. Most of appellees' arguments went to representations Cross made as Home–Stake's auditor. He issued opinions on the 1969 and 1970 Program's start up balance sheets. He certified Home–Stake's Consolidated financial statements for those years. Cross's opinions and certification letters were reproduced in prospectuses, annual reports, registration statements, and other Home–Stake promotional material. Appellees' expert testified that Cross must have known that his opinions themselves were false and misleading. Based on the verdicts the jury returned against all the defendants, it could have concluded that any or all of

these representations were false and misleading, that Cross was reckless in making the representations, and that Cross knew or should have known that his representations would reach potential investors and that they would reasonably rely on them.

## 2. Does the Aiding and Abetting Instruction Taint the Verdict?

Although the record supports finding Cross liable for a primary violation of § 10(b), we still must determine whether the jury *did* find him liable as a primary violator. Appellant urges us to remand for a new trial on the theory that it is not clear from the jury verdict whether Cross's liability under Rule 10b–5 rested on finding a primary or aiding and abetting violation.[13] *See, e.g., Dillard & Sons Constr., Inc. v. Burnup & Sims Comtec, Inc.,* 51 F.3d 910, 915–17 (10th Cir. 1995) (requiring new trial where jury returned general verdict and one of the jury instructions was erroneous). It is uncontested that the jury was instructed on aiding and abetting, as well as primary, liability, and

a public company has a special public responsibility, in view of the great reliance investors place on financial statements; an auditor's scrutiny of these statements is necessary to "assure[ ] that the integrity of the securities markets will be preserved"). With respect to actionable omissions, investor reliance will be presumed. *Affiliated Ute Citizens,* 406 U.S. at 153–54, 92 S.Ct. at 1472.

13. After instructing the jury on the elements of a Rule 10b–5 violation, the district court continued:

PLAINTIFFS HAVE ALSO CHARGED THESE DEFENDANTS WITH AIDING AND ABETTING A VIOLATION OF RULE 10(B)(5) [sic]. A CLAIM OF AIDING AND ABETTED [sic] A VIOLATION OF RULE 10(B)(5) MAY BE ASSERTED AGAINST ANY PARTY WHO KNOWINGLY OR RECKLESSLY RENDERS SUBSTANTIAL ASSISTANCE TO SOMEONE ELSE WHO VIOLATES RULE 10(B)(5).
IN ORDER TO PROVE LIABILITY OF ANY OF THE DEFENDANTS FOR AIDING AND ABETTING A VIOLATION OF RULE 10(B)(5), PLAINTIFFS MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THE FOLLOWING 3 ELEMENTS: FIRST, THAT SOME OTHER PERSON OR ENTITY VIOLATED RULE 10(B)(5). PLAINTIFFS HAVE THE BURDEN OF PROVING BY A PREPONDERANCE OF THE EVIDENCE ALL OF THE EL-

EMENTS THAT MUST BE SHOWN TO PROVE A VIOLATION OF RULE· 10(B)(5) BY SUCH OTHER PERSON. AND I HAVE JUST INSTRUCTED YOU ON THAT. SECOND, WHAT THE DEFENDANT—THAT THE DEFENDANT WHO ALLEGEDLY AIDED AND ABETTED THE VIOLATION OF RULE 10(B)(5) POSSESSED A GENERAL AWARENESS OF THE WRONG AND HIS ROLE IN FURTHERING IT; AND, THIRD, THAT THE ALLEGED AIDER AND ABETTOR KNOWINGLY OR RECKLESSLY RENDERED SUBSTANTIAL ASSISTANCE TO THE PERSON OR ENTITY WHICH VIOLATED RULE 10(B)(5). RECKLESSLY MEANS AN EXTREME DEPARTURE FROM THE STANDARDS OF ORDINARY CARE WHICH PRESENTS A DANGER OF MISLEADING BUYERS THAT IS EITHER KNOWN TO THE DEFENDANT OR IS SO OBVIOUS THAT THE DEFENDANTS [sic] MUST HAVE BEEN AWARE OF IT. IT IS NOT ENOUGH THAT THE DEFENDANT WAS SIMPLY CARELESS OR NEGLIGENT. BECAUSE YOU CANNOT KNOW WHAT A PERSON IS THINKING, YOU MUST DETERMINE KNOWLEDGE OF FALSITY OR RECKLESSNESS BY THE EVIDENCE OF THE DEFENDANT'S ACTS AND WORDS IN LIGHT OF ALL OF THE SURROUNDING CIRCUMSTANCES AT THE TIME.

returned a general verdict against Cross.[14] First, however, we must determine whether Appellant's request to remand for a new trial is an issue that was properly preserved for appeal.

### a. Waiver

█ It was in a reply brief before the district court that appellant first asserted that ambiguity in the jury verdict necessitated a new trial. On appeal, appellees argue that appellant did not properly raise the issue of a new trial before the district court and, consequently, the issue is waived. In the district court, appellant raised the effect of *Central Bank of Denver* on the jury's verdict in her Supplement to Motion to Alter or Amend Judgment and Brief in Support ("Motion to Alter Judgment"). In that pleading, appellant argued that the evidence before the jury could not support a finding of primary liability, and that the verdict must be reversed because of the Supreme Court's decision in *Central Bank of Denver*.[15] In response, appellees argued that the jury could have found—and did find—Cross liable for primary § 10(b) and Rule 10b–5 violations. Appellant, in her reply brief, responded to appellees' position, arguing in the alternative that if it were not clear that the jury found Cross liable as an aider and abettor, it certainly was not obvious that he was found liable as a primary violator—thus a new trial was necessary to determine Cross's liability.[16]

The district court, in its order disposing of appellant's postjudgment motion, found that the parties agreed that the general verdict returned by the jury in this case does not distinguish between primary and aiding and abetting violations, and continued that "the issue here is whether the evidence supports a finding that Norman Cross' conduct consti-

tuted a primary violation of § 10(b)." The district court denied appellant's motion, but did not directly address the jury's findings with respect to primary liability, and completely ignored appellant's request for a new trial based on ambiguity in the general verdict.

█ "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *see also Rademacher v. Colorado Ass'n of Soil Conservation Dists. Medical Benefit Plan,* 11 F.3d 1567, 1571 (10th Cir.1993) (issues not argued to the district court "ordinarily will not be considered on appeal"). The purpose of the discretionary rule requiring the lower court to have passed on an issue for its preservation on appeal is to ensure "'that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence ... [or] to present whatever legal arguments [they] may have....'" *Lyons v. Jefferson Bank & Trust,* 994 F.2d 716, 720 (10th Cir.1993) (quoting *Singleton,* 428 U.S. at 120, 96 S.Ct. at 2877) (further internal quotation omitted). Allowing appellants to present issues not raised below would also undermine "the 'need for finality in litigation and conservation of judicial resources.'" *Tele–Communications, Inc. v. Commissioner of Internal Revenue,* 12 F.3d 1005, 1007 (10th Cir.1993) (quoting *Hicks v. Gates Rubber Co.,* 928 F.2d 966, 970–71 (10th Cir.1991)). "The policy of declining to consider an argument not raised below is strongest where the district judge was not aware of the argument." *Hicks,* 928 F.2d at 970 (quoting *Richerson v. Jones,* 572 F.2d 89, 97 (3d Cir.1978)).

**14.** The Rule 10b–5 verdict against Cross for the 1970 Program Class read: "We, the jury, do find that Norman C. Cross, Jr. is liable to William Grohne and members of the 1970 Program Class for violation of Rule 10b–5." The jury returned similar verdicts in favor of the 1969 class plaintiffs.

**15.** In her Motion to Alter Judgment, appellant described Cross's conduct alleged in the record, the jury instructions on primary and aiding and

abetting liability, as well as the general verdict forms returned by the jury with respect to Cross. Appellant concluded, "[t]he decision in *Central Bank* dictates a finding here that the underlying judgment must be vacated and reversed."

**16.** Appellant had moved for a new trial at the conclusion of the damages phase of the original trial in 1989. In addition, appellant requested oral argument on issues raised in her Motion to Alter Judgment.

Of course the rule is not inflexible and " 'the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.' " *Colorado Interstate Corp. v. CIT Group/Equip. Fin., Inc.*, 993 F.2d 743, 751 (10th Cir.1993) (quoting *Singleton*, 428 U.S. at 121, 96 S.Ct. at 2877) (reviewing issue for first time on appeal; issue was considered by district court, although without the benefit of argument, and issue was a question of law that was fully briefed on appeal).

This is an appropriate case to exercise our discretion and consider whether remand for a new trial is necessary. Even characterizing the requested remand for a new trial as an "issue" rather than an alternative form of relief, it is appropriate in these unique circumstances to consider the matter. It would not satisfy any policy behind the rule to turn our back on this significant question. Appellant's opening brief did raise the problem with the jury instructions in the wake of *Central Bank of Denver.* She pointed out the instructions and the general verdicts returned by the jury. The issue of remand to determine Cross's liability arose only in response to appellees' contention that the jury found Cross a primary violator; the evidence against Cross was discussed at great length. Appellees raised both factual and legal reasons why the jury found Cross liable as a primary violator. Raising the issue of a new trial in the reply brief caused appellees no prejudice. The district court had the issue adequately before it. This issue has been extensively briefed on appeal, and no factual findings by the district court can guide us in resolving this question; if the jury could have found Cross liable as an aider and abettor rather than as a primary violator, we must remand. Finally, appellant's position below was consistent with its position on appeal. In this very old, very complex case it serves no purpose to ignore the possibility that appellant was found liable on a more than forty million dollar judgment based on a nonexistent cause of action.

**b. Can the jury verdict stand?**

Appellant contends that the jury instruction on aiding and abetting liability, a theory of liability that has since been determined incorrect, taints the entire general verdict. She requests a new trial to determine Cross's liability under § 10(b). Appellees, although conceding that the aiding and abetting instruction was erroneous, argue that the overwhelming evidence against Cross as a primary violator avoids the need for a new trial. In effect, appellees suggest that even with the improper instruction it is clear that the jury returned a verdict against Cross as a primary violator.

█ Generally, where a jury has returned a general verdict and one theory of liability upon which the verdict may have rested was erroneous, the verdict cannot stand because one cannot determine whether the jury relied on the improper ground. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–36, 8 L.Ed.2d 305 (1962) (reversing jury verdict in favor of plaintiffs for conspiracy to violate antitrust acts where defendants were exempt from one of the theories of liability submitted to jury). Although in the past we allowed jury verdicts to stand if the improper instruction was harmless, *see Lusby v. T.G. & Y Stores, Inc.*, 749 F.2d 1423, 1436 (10th Cir.1984), *vacated sub nom. City of Lawton v. Lusby*, 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985), more recently we have adhered strictly to the general rule and have remanded cases where we could not say "with absolute certainty" that the jury was not influenced by the submission of the improper or erroneous instruction. *Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1299–1301 (10th Cir.1989) (citing *McMurray v. Deere and Co.*, 858 F.2d 1436 (10th Cir.1988) and *Smith v. FMC Corp.*, 754 F.2d 873 (10th Cir.1985)).

*Farrell* demonstrates how far a party must go to overcome the presumption of taint in a general verdict based on multiple theories of liability, one of which was improper. There, an iron worker injured in a fall sued a company he believed improperly manufactured his safety harness. The defendant argued that it did not make the harness plaintiff

used and, alternatively, either that the harness was improperly used or that plaintiff assumed the risk. The trial court instructed the jury on improper use and assumption of the risk. The jury returned a general verdict for defendant. On appeal, we found insufficient evidence to support the jury instruction regarding improper use of the harness. We noted that defendant presented overwhelming evidence that it did not manufacture the harness plaintiff used, and that the abnormal use defense was not referred to in either the opening statements or the closing arguments. We considered it "highly unlikely that the jury's verdict was affected by the abnormal use instruction." *Id.* at 1298. Nevertheless we remanded the case for a new trial because we could not "say with absolute certainty that the jury was not influenced by the submission of the improper instruction." *Id.* at 1301.

■ The posture of this case bears striking parallels to *Farrell.* The bulk of the evidence and the argument on Cross's liability involved his certification of balance sheets included in prospectuses made available to the Program investors, and his audits and opinion letters on Home–Stake's consolidated financial statements. The thrust of the evidence went to his acts as a primary violator. Yet, some evidence and arguments in the record could be interpreted as going to aiding and abetting liability rather than to actual statements or omissions. For example, it is not clear whether the jury treated the entire Program prospectuses as representations attributable to Cross, or whether Cross was held liable for failing to insure that the prospectuses, prepared in large part by Home–Stake, were not misleading.

Appellees suggest that we can tell from the verdict forms that the jury found Cross liable as a primary violator, particularly because it found him liable for violating § 11 of the 1933 Act, 15 U.S.C. § 77k. Because liability under § 11 requires finding that Cross allowed his name to be used in connection with a registration statement containing false or misleading information, *see* 15 U.S.C.

§ 77k(a)(4), the jury found that Cross made an actionable misrepresentation. The jury also found Cross liable under Rule 10b–5, which includes the element of scienter. By combining the § 11 and 10b–5 verdicts, all the elements of primary liability are satisfied.

While appellees' premises are accurate, the conclusion of primary liability does not necessarily follow. The syllogism flounders upon the possibility that § 11 liability attached to Cross for different representations than the Rule 10b–5 liability. Unlike liability under 10b–5, parties can be held liable under § 11 even for negligent misrepresentations; accountants bear the burden of demonstrating due diligence once a plaintiff shows a material misstatement or omission in a registration statement. 15 U.S.C. § 77k(b); *Herman & MacLean,* 459 U.S. at 382, 103 S.Ct. at 687. Rule 10b–5 violations require a showing of scienter because it, unlike § 11, is an anti-fraud provision. *Id.*

In this case, the jury may have found § 11 liability against Cross for negligently certifying the Program registration statements, or, more specifically, the start-up balance sheets. Rule 10b–5 liability could have been based on recklessness in his audit of Home–Stake's financial statements (which were not included in the 1969 or 1970 Program registration statements), or in his failure to properly supervise the remainder of the Program prospectuses. *See id.* at 381 n. 11, 103 S.Ct. at 686 n. 11 ("Accountants are liable under § 11 only for those matters which purport to have been prepared or certified by them."). It is possible that the jury findings of a material misrepresentation and Cross's reckless state of mind never matched up.[17]

It is obvious from our discussion analyzing accountant behavior under § 10(b) that distinctions in conduct between primary and secondary liability are elusive. Prior to *Central Bank of Denver* the distinction was academic. Now it is pivotal. The general verdicts shed no light on whether the jury found Cross liable because of his substantial assistance to Home–Stake's independent fraudulent acts, or whether his liability rested on

---

**17.** Appellees argue that no evidence supported an aiding and abetting verdict. We need not determine whether this is correct, however, be-

cause the instruction, whether warranted or not, could have influenced the jury. *See Farrell,* 866 F.2d at 1297–1301.

actual representations he made that reached investors. The chances that the jury was confused by the aiding and abetting instruction cannot be dismissed as remote—and even if remote, *Farrell* requires us to remand.

■ Although not raised by the parties, the dissent believes that appellant is not entitled to the rule in *Farrell* because she did not object at trial to the aiding and abetting instruction and did not request a special interrogatory on aiding and abetting liability. In the ordinary case, pursuant to Fed. R.Civ.P. 51, when a party fails to object to a jury instruction or request a special interrogatory a general jury verdict is upheld "where there is substantial evidence supporting any ground of recovery in favor of an appellee." *Union Pac. R.R. Co. v. Lumbert,* 401 F.2d 699, 701 (10th Cir.1968) (quotation omitted).[18] The policy underlying the objection requirement in Rule 51 is to force the parties to give the trial court an adequate opportunity to cure an error in the instructions before the jury is sent out to deliberate. *Metromedia Corp. v. Fugazy,* 983 F.2d 350, 363 (2d Cir. 1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). On the other hand, a countervailing policy is that absent injustice we apply the law in effect at the time we render a decision. *See Peterson v. Shearson/American Express, Inc.,* 849 F.2d 464, 466–67 (10th Cir.1988).

The dissent does not refer to any case applying the substantial evidence or plain error standard to litigants whose claimed error was based on a change in the law that arose after trial. To the contrary, in *Key v. Rutherford,* 645 F.2d 880 (10th Cir.1981), we refused to apply Rule 51 in just such a situation. There, the plaintiff in a § 1983 case failed to object to an instruction giving the defendant municipality qualified immunity based on the good faith of its members. At the time of the jury verdict, the availability of qualified municipal immunity was an unsettled question. The Supreme Court thereafter decided, in *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63

L.Ed.2d 673 (1980), that municipalities were not entitled to such a rule. We held that:

> The trial judge here did not have the benefit of the *Owen* decision when he formulated his instructions. On this record, the jury could have found in favor of [appellee] solely because of the good faith defense instruction. We believe that the interests of justice are best served by remanding this case for a new trial ... in light of the holding in *Owen.*

*Key,* 645 F.2d at 883. *See also Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1495 (9th Cir.1986) (failing to object as required by Rule 51 does not preclude appeal based on supervening change in the law of employment discrimination); *United States v. Washington,* 12 F.3d 1128, 1139 (D.C.Cir.) ("The supervening-decision doctrine reflects the principle that it would be unfair, and even contrary to the efficient administration of justice, to expect a defendant to object at trial where existing law appears so clear as to foreclose any possibility of success"), *cert. denied,* — U.S. —, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994).

When the jury instructions were tendered in this case, at least six published opinions of this court recognized an implied private cause of action for aiding and abetting a 10b–5 violation. *See U.S. Indus., Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1231 (10th Cir. 1988); *Windon Third Oil and Gas Drilling Partnership v. FDIC,* 805 F.2d 342, 344–45 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987); *Cronin v. Midwestern Okla. Dev. Auth.,* 619 F.2d 856, 860 (10th Cir.1980); *McCown v. Heidler,* 527 F.2d 204, 207 (10th Cir.1975); *Zabriskie v. Lewis,* 507 F.2d 546, 553 (10th Cir.1974); *Kerbs v. Fall River Indus., Inc.,* 502 F.2d 731, 740 (10th Cir.1974). It was likewise clear in 1988 that one who aided and abetted a fraudulent scheme shared equal liability with the primarily violators. *McCown,* 527 F.2d at 207. Thus it would have been futile for appellant to object below either to the aiding and abetting instruction or the general verdict form. Like the court

---

**18.** None of the cases cited by the dissent stands for the proposition that we affirm a general jury verdict if substantial evidence supports any ground of recovery, *even if objection to a jury instruction was timely made under Rule 51.*

Rather, the cases, including *Lumbert,* involve the failure to raise an error in the instructions or the verdict before the jury was discharged, and a failure to ask for a specific interrogatory.

in *Key*, we believe that in this case the interests of justice and the policies underlying Rule 51 reject forcing an appellant to object to a jury instruction where, based on the state of the then applicable law, her objection would have been futile.

### C. Scienter

Appellant argues that remand is unnecessary, and that we should reverse the judgment because Cross only acted recklessly with respect to the Home–Stake fraud, and recklessness does not satisfy the scienter requirement for liability in a civil action under § 10(b). The district court correctly rejected this argument.[19]

A private cause of action for damages under § 10(b) and Rule 10b–5 will not lie in the absence of proof of "scienter," defined as "the *intent* to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) (emphasis added). In *Ernst & Ernst*, the Court expressly declined to address "the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5." *Id.* at 193–94, n. 12, 96 S.Ct. at 1381, n. 12. The Supreme Court has still not spoken on this question. In *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir.1982), this court held that "recklessness" satisfies the scienter requirement for a primary violation of § 10(b).[20] We defined "recklessness" as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 1118 (quotation and citation omitted).[21] Appellant contends that *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982 (10th Cir.1992), overrules *Hackbart sub silentio*. Alternatively, she argues that *Hackbart* is inconsistent with the reading given *Ernst & Ernst* by *Central Bank of Denver* and must now be overruled. Neither proposition is correct. However, some language in *Farlow* does support appellant's argument.

*Farlow* involved a claim against an accounting firm for aiding and abetting a securities fraud scheme; the court's opinion focused primarily on the extent to which the pleading requirements of Fed.R.Civ.P. 9(b) apply to securities fraud claims. According to the court, in order to establish primary liability under § 10(b), a party must allege and prove:

> facts showing that the conduct complained of occurred "in connection with" the purchase or sale of a security—that the actor made an untrue statement of a material fact, or failed to state a material fact, *that in so doing, the party acted knowingly with intent to deceive or defraud,* and that plaintiff relied on the misrepresentations, and sustained damages as a proximate result of the misrepresentation.

*Id.* (citing *Stevens v. Vowell*, 343 F.2d 374 (10th Cir.1965)) (emphasis added). Later in the opinion, however, the court quotes approvingly from *Ross v. Bolton*, 904 F.2d 819 (2d Cir.1990), that for aiding and abetting liability, as opposed to primary liability, the scienter requirement increases from recklessness, " 'so that [plaintiffs] need to show that [defendants] acted with actual intent.' " *Farlow*, 956 F.2d at 987 (quoting *Ross*, 904 F.2d at 824).

While *Farlow* can be read to support either reckless disregard or actual intent as the standard for scienter, it did not expressly overrule *Hackbart*, and later Tenth Circuit decisions approve of the recklessness standard for primary violations. *See First Interstate Bank of Denver, N.A. v. Pring*, 969 F.2d 891, 901 (10th Cir.1992), ("The established rule is that recklessness is sufficient scienter for a primary violation of § 10(b) and Rule 10b–5"), *rev'd on other grounds sub nom., Central Bank of Denver, N.A. v. First*

---

19. For purposes of this analysis we assume Cross acted only recklessly. Appellees do not claim that Cross's behavior was knowing or intentional.

20. Every circuit that has decided the issue likewise allows the scienter element to be fulfilled by a showing of recklessness. *See generally Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 n.

6 (9th Cir.1990) (citing standard in ten circuits), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

21. The trial court in this case relied on the *Hackbart* definition of "recklessness" when giving the jury instruction.

*Interstate Bank of Denver, N.A.,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). This circuit still maintains that recklessness as defined in *Hackbart* is sufficient scienter for finding civil § 10(b) primary violations.[22]

## CONCLUSION

This is a very old case, and it is with a heavy heart that we act to prolong it. Our decision, however, is mandated by a supervening change in the law of securities fraud. We REVERSE the district court's judgment and REMAND the case against appellant for a new trial to determine whether, in light of *Central Bank of Denver,* Cross violated § 10(b) and Rule 10b–5. Because we remand the case against appellant in its entirety, we do not address the issue of prejudgment interest.

BRORBY, Circuit Judge, dissenting.

I dissent.

The significant facts are simple. Appellant failed to object to a jury instruction and she likewise failed to object to the use of a general verdict. She now asks for a retrial due to a court-made change in the law occurring five years after the trial.

I would apply *Union Pacific R.R. v. Lumbert,* 401 F.2d 699, 701 (10th Cir.1968). This case quite simply holds where no objection was made to the use of a general verdict, the general verdict must be upheld where there is substantial evidence supporting any ground of recovery. The majority correctly concludes there exists substantial supporting evidence. I see no reason to reward Appellant for her failure to object.

An examination of applicable case law within the circuit reveals inconsistencies. We have applied the "absolute certainty" analysis now utilized by the majority. We have also applied a harmless error analysis and the substantial evidence analysis which I advocate in this dissent.

The majority applies the "absolute certainty" analysis as advanced by this court in *Farrell v. Klein Tools, Inc.,* 866 F.2d 1294, 1299–1301 (10th Cir.1989). As the majority

notes, *Farrell* relied on two then recent Tenth Circuit opinions in rejecting, without overruling, the harmless error standard we had previously applied. (Majority slip opinion at 1229.) *See Asbill v. Housing Authority of Choctaw Nation of Okla.,* 726 F.2d 1499, 1504 (10th Cir.1984) (applying a "litmus test" to see whether the appellant was unjustly prejudiced); *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1436 (10th Cir.1984), *cert. granted and vacated on other grounds,* 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985); *Employers Liab. Assurance Corp. v. Freeman,* 229 F.2d 547, 551 (10th Cir.1955). *Farrell* and the majority opinion describe the general rule "that when one of two or more issues submitted to the jury was submitted erroneously, a general verdict cannot stand because it cannot be determined whether the jury relied on the improper ground." *Farrell,* 866 F.2d at 1299. Although the *Farrell* opinion outlines in great detail the inconsistency in our circuit regarding the use of the harmless error standard and the absolute certainty analysis, it fails to address whether an objection to the general verdict form had been made at trial. This distinction is important in light of the cases within our circuit which hold that "in the absence of a pertinent objection to the charge or a request for a specific interrogatory a 'general verdict is upheld where there is substantial evidence supporting any ground of recovery in favor of an appellee.'" *Lumbert,* 401 F.2d at 701 (*quoting Vareltzis v. Luckenbach S.S. Co.,* 258 F.2d 78, 80 (2d Cir.1958)).

The *Lumbert* decision and its progeny carve out a pertinent exception to the general rule which the majority fails to acknowledge. *See Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 703 F.2d 1152, 1176 & n. 20 (10th Cir.1981) *(en banc) (plurality opinion), cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983) (holding that where no objection was made to the charge and there was sufficient evidence to sustain ruling under other theories "any error in submitting the [improper] theory should not now be considered on appeal"). *See also Hinds v. General Motors Corp.,* 988

---

22. *Central Bank of Denver* does not address the scienter requirement for primary violations. In noting that § 10(b) only proscribes "knowing or intentional conduct," the Court does no more than quote *Ernst & Ernst,* which itself left open the possibility that "knowing or intentional" could include reckless. *Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1446.

F.2d 1039, 1047 (10th Cir.1993) (holding that "'a party's failure to object to a verdict on the ground of inconsistency prior to the jury's discharge waives his right to raise the issue in a posttrial motion or on appeal unless the verdict is inconsistent on its face so that entry of judgment upon the verdict is plain error'" (quoting *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1424 (10th Cir.), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986))); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1522 (10th Cir.) (holding that nonobjected-to general verdict should be upheld "if the proof on various theories is sufficient to sustain the general verdict."), *cert. granted*, 469 U.S. 1071, 105 S.Ct. 562, 83 L.Ed.2d 503 (1984), *aff'd*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Other circuits also apply this rule. *See Vareltzis*, 258 F.2d at 80; *State Fuel Co. v. Gulf Oil Corp.*, 179 F.2d 390, 396 (1st Cir.1950); *Cross v. Ryan*, 124 F.2d 883, 887 (7th Cir.1941), *cert. denied*, 316 U.S. 682, 62 S.Ct. 1269, 86 L.Ed. 1755 (1942).

The confusion regarding whether the harmless error standard or the absolute certainty or substantial evidence analysis should be applied is perpetuated because many of the opinions dealing with this issue either acknowledge one standard, then apply another or fail to specify whether an objection was made to the use of a general verdict form at trial. *See City of Wichita v. United States Gypsum Co.*, 72 F.3d 1491 (10th Cir.1996); *Farrell*, 866 F.2d 1294; *McMurray v. Deere & Co.*, 858 F.2d 1436 (10th Cir.1988); *Smith v. FMC Corp.*, 754 F.2d 873 (10th Cir.1985). This confusion is also enhanced by the similarity between the harmless error standard and the substantial evidence analysis. However, because no objection was made to the use of a general verdict form I do not believe it is appropriate to apply either the harmless error standard or the absolute certainty analysis in this case. Instead, I believe that *Lumbert* mandates we affirm the verdict if there is substantial evidence supporting any permissible ground of recovery. I agree with the majority's findings that "the record supports finding Cross liable for a primary violation of § 10(b)" and would therefore affirm the jury's verdict. (Majority opinion at 1227.)

I also find it important to note that Fed. R.Civ.P. 51 precludes a party from assigning "as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict." In *Comins v. Scrivener*, 214 F.2d 810, 814 (10th Cir.1954), we held that where no exceptions were taken to the jury instructions, no question was preserved for appeal regarding the instructions. *See also City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981) (holding that no "'right' to review existed at all once petitioner failed to except to the charge at trial."). To mitigate the harshness of this rule appellate courts have invoked on occasion a review for plain error. *City of Newport*, 453 U.S. at 256, 101 S.Ct. at 2754. In the Tenth Circuit, we have "recognized a narrow exception to the application of Rule 51 in the interest of justice." *Glasscock v. Wilson Constructors, Inc.*, 627 F.2d 1065, 1068 (10th Cir.1980). However, we rarely apply this narrow exception. *Id.* In the case at bar, we know that no objection was made to the aider and abettor instruction before the jury retired to deliberate. It is true that at the time of trial the instruction correctly stated the applicable law, however, that does not mandate the result that a case can be tried and no objection made and then an appellant be allowed to take advantage of a change in the law which occurs five years later simply because a jury may have acted upon the instruction. I do not believe the interests of justice support such a windfall. I also do not find these circumstances rise to the level of plain error.

I am aware of the Supreme Court's holding in *O'Connor v. Ohio*, 385 U.S. 92, 93, 87 S.Ct. 252, 253–54, 17 L.Ed.2d 189 (1966) (per curiam), that a defendant's "failure to object to a practice that Ohio had long allowed cannot strip him of his right to attack the practice following its invalidation by this Court." I believe this opinion is distinguishable, however, because *O'Connor* dealt with a criminal defendant's constitutional right to remain silent rather than with a statutorily created basis of liability. The opinion and those following it also differ in that they involve changes in the Supreme Court's interpretations of state laws. *See also United States v. Zeigler*, 19 F.3d 486, 494 (10th Cir.),

*cert. denied,* —— U.S. ——, 115 S.Ct. 517, 130 L.Ed.2d 422 (1994) (excusing the government's failure to object to sentence below because it was in accordance with then applicable law); *Doby v. Beto,* 371 F.2d 111, 113 (5th Cir.1967) (holding that failure to object cannot bar appellant from challenging validity of a search warrant because he could not be charged with failure to anticipate the Supreme Court's invalidation of a long-settled Texas practice).

The bottom line is the appellant in this case did not object to the jury instruction on aider or abettor liability or to the use of a general verdict form. By failing to object she waived her right to appeal the jury verdict where it was supported by substantial evidence and the interests of justice do not require otherwise. If anything, the interests of justice require that after nearly twenty-three years of traveling up and down the judicial system, this case finally be laid to rest. For these reasons I respectfully dissent.