SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

AUTOCORP EQUITIES, INC., Michael
Carnicle, Robert Cord Beatty, Hillel
Sher, Amotz Frenkel, and Nili Frenk-
el, Defendants.

and

Nili Frenkel, Relief Defendant.

No. 2:98–CV–00562 PGC.

United States District Court,
D. Utah,
Central Division.

Dec. 8, 2003.

Brent R. Baker, Robert K. Hunt, Utah Federal Defender Office, Karen L. Mar-

tinez, Thomas M. Melton, Salt Lake City, UT, for Plaintiffs.

Michael Carnicle, Las Vegas, NV, Amotz Frenkel, Nili Frenkel, Oak Park, CA, Mark J. Griffin, Woodbury & Kesler, Salt Lake City, UT, for Defendants.

Ronald F. Price, David W Scofield Parsons, Kinghorn, Peters, Salt Lake City, UT, for Hiller Sher.

## OPINION AND ORDER GRANTING AND DENYING SUMMARY JUDGMENT IN PART

CASSELL, District Judge.

This securities fraud case is before the court on motions by plaintiff Securities and Exchange Commission (SEC) for summary judgment. The SEC filed one motion for summary judgment (56–1) against defendants Robert Cord Beatty, Hillel Sher, Amotz "Bobby" Frenkel, and Nili Frenkel and a separate motion for summary judgment (96–1) against defendant Michael Carnicle. The court now grants these motions in part as set forth below.

### FACTS

One of the 1980s' most memorable contributions to pop culture was *American Gladiators,* a TV game show that pitted contestants against bodybuilders clad in red-white-and-blue uniforms in tests of strength and skill. Although the American Gladiators concept began as a TV program, like many fads, it promised to be a big money maker, and show creator Johnny Ferraro decided to take the show on the road. Because Ferraro shared production rights with the Samuel Goldwyn Company (Goldwyn), it was necessary for Goldwyn to sign off on any performances that Ferraro wanted to stage, and in July 1993 Goldwyn agreed to let Ferraro stage a live production "at and only at a fixed facility (the "Facility") in Las Vegas, Nevada." [1]

Based on this agreement, Ferraro arranged to do the show at the Imperial Palace Casino in Las Vegas. Because the agreement between Goldwyn and Ferraro referred to the venue for the show only as "the Facility," it is unclear whether the Imperial Palace was the only acceptable venue or one of many possible options. In any case, although the Imperial Palace was willing to host the event, it was unwilling to fund the production. Thus, Ferraro had to seek outside sources of funding.

It was at this juncture that Ferraro met Cord Beatty, a defendant in this case. When Ferraro and Beatty met, Beatty was a managing member of Diamond Entertainment LLC. Ferraro and Beatty agreed to form a new corporation called AmGlad, Inc., which was jointly owned by Diamond and Ferraro's company, Flor–John Films, Inc. AmGlad owned the production rights to the live American Gladiators show, and Beatty and Ferraro both worked to secure funding for the Las Vegas production.

In December 1993, they met Michael Carnicle, another defendant in this case. Carnicle was associated with a company called M & M Investments. M & M and Carnicle came on board to help secure funding for the production. Ultimately, Carnicle suggested they take Diamond public and raise capital by selling shares on a publicly traded market. Rather than try to take Diamond public on its own, Carnicle suggested they merge Diamond with an existing public company. Carnicle

---

**1.** Letter from Laurence M. Marks to David Berson of July 9, 1993, at 1.

found a company called Eagle Automotive that was willing to merge with Diamond. There is some dispute as to what representations convinced Eagle to merge with Diamond, but the details of that negotiation are unimportant here.

Unfortunately Eagle was in the process of divesting itself of its assets, so Diamond would have to be worth five million dollars coming into the merger in order for Eagle to keep its NASDAQ listing. Since Diamond did not have substantial assets at that time, Diamond would have to acquire several million dollars' worth of assets in order to facilitate the merger. Although Carnicle's plan was very complicated and involved a number of different entities (Diamond Entities), the ultimate effect was that Eagle and the Diamond Entities would merge to form a new company called Chariot Entertainment, which would own the rights to the American Gladiators show. Chariot's sole purpose would be to promote and produce live performances of American Gladiators at the Imperial Palace.

At some point in the process, Carnicle introduced the idea of acquiring Russian certificates of deposit (CDs) instead of merging. Carnicle had located a broker named Bobby Frenkel. Frenkel is named as a defendant in this case. Frenkel knew a man named Hillel Sher, another defendant in this case, who claimed to be the exclusive representative of the Russian bank Skinektica. Frenkel and Sher had collaborated in the past to secure assets for other companies and were willing to help Chariot acquire Russian CDs with a maturity value of five million dollars.

Although the record is not fully developed as to the extent Frenkel and Sher knew about Chariot's position, one thing is clear: they knew why Chariot wanted the CDs. Both Frenkel and Sher knew that Chariot wanted the CDs for "asset enhancement"—that is, they understood that Chariot wanted the CDs so its balance sheet would allow it to be listed on NASDAQ and sell stock publicly.[2] Frenkel also stated in deposition that his understanding from the beginning was that Chariot wanted the CDs so they could raise capital in the form of loans.[3]

Carnicle arranged for the CDs to be acquired in exchange for Chariot stock. The CDs would be provided by Frenkel's company, F & P Investments (F & P), which was ostensibly "the holder in due course of certain proceeds and/or assignments of various Certificates of Deposits ... issued by the Commercial Bank Skinektica."[4] F & P would "transfer to [Chariot] its rights, title, and interest in the proceeds of the CD's."[5] In exchange, F & P would receive 2.8 million shares of Chariot stock. Roughly 1.4 million of the Chariot shares would be held in escrow by M & M, and the other 1.4 million would go to F & P Investments. Of shares issued to F & P, half would be issued to Yocheved Datner, an Israeli national, pursuant to SEC Regulation S.

Although Beatty was initially skeptical about acquiring Russian CDs, Carnicle

---

2. Testimony of Hillel Sher of Nov. 22, 1994, at 271–75; Testimony of Robert Cord Beatty of Nov. 18, 1994, at 57–58.

3. Deposition of Amotz Frenkel of Feb. 13, 2001, at 17.

4. Memorandum of Understanding Between F & P Investment Corp. and On Line Consulting, Inc. of Mar. 23, 1994, at 1.

5. *Id.* at 1.

prevailed on him to consent to the acquisition. Carnicle assured him that everything was above board and encouraged him to have professionals verify all the details of the transaction. When Beatty asked why certain shares had to be issued as unregistered Regulation S shares, Carnicle responded that it had to be done that way to get the deal.

Carnicle represented that an attorney named Karl Mangum had structured the deal. Beatty had Duane Midgley, a certified public accountant, authenticate the CDs, and the details of the transaction were reviewed and approved by Nathan Drage, counsel to the Diamond Entities. With the accountant's and the lawyer's approval, Beatty agreed to exchange Chariot shares for the CDs from F & P.

In spite of these professional reviews, certain facts undermined the success of the transaction. Most significantly, the CDs turned out to be fake. Sher admits that he created the CDs on blue check paper at a Kinko's in Florida, although he claims to have been authorized by the bank. Not surprisingly, the CDs were worthless. Subsequent analysis of the CDs by Andrey Koslov, Deputy Chairman and Chief of the Securities Division of the Central Bank of the Russian Federation, revealed that the CDs could not have been legally issued by a Russian bank because they were deficient in a number of ways. Furthermore, while the CDs were expressly sought to raise money, the terms of the agreement expressly limited their ability to "encumber, lien, pledge, or hypothecate" the principal,[6] a limitation that Sher explained was imposed by the issuing bank. Finally, although F & P was ostensibly the

owner of the CDs, the CDs were apparently issued in exchange for a $2 million promissory note rather than any kind of deposit. Sher and Frenkel intended to use the Chariot shares to pay for the CDs. Accordingly, some of the unregulated shares were sold to Frenkel's wife Nili Frenkel (Nili), who is also a defendant in this case. She in turn sold the unregulated shares for a profit.

Apparently unaware of these details, on March 23, 1994, Diamond Entities and F & P agreed to the exchange of Chariot shares for the CDs. Having gone public, Chariot appeared to be on track to make the American Gladiators show a reality. The CDs were about 30% of Chariot's assets and were included on its balance sheets and financial statements. In late March 1994, Beatty hired Judith Jarvis of the law firm of Broad and Cassel to represent Chariot in securities matters. On March 31, 1994, Chariot filed a Form 10–Q with the SEC, listing the CDs as an asset, and on April 5, 1994, Chariot filed registration form S8 with the SEC. Chariot tried to raise money for the Las Vegas show by selling its stock on the public market, and issued a number of press releases that described the Las Vegas show and its role in making the show a reality.

However, things did not work out as was hoped. Beatty unsuccessfully tried to secure a loan based on the CDs and was removed as president in May. Though no longer president, Beatty continued to seek funding, but by June 1994 Chariot had no liquid assets. In July Beatty spoke with Frenkel about his inability to secure a loan. Frenkel informed him that under the terms of the March 23 agreement,

---

6. Memorandum of Understanding Between F & P Investment Corp. and On Line Consult-

ing, Inc. of Mar. 23, 1994, at 1.

Chariot did not have the right to get a loan based on the CDs. Surprised by this information, Beatty approached Nathan Drage, who reviewed the agreement and confirmed that it did not give Chariot the right to get loans on the CDs.

To further complicate matters, Chariot lost the Imperial Palace lease. Under the terms of the agreement, Chariot was to post a $150,000 performance bond. Because Chariot was unable to post the bond, the Imperial Palace notified Chariot on August 26, 1994, that it considered Chariot to be in material breach and that it would no longer perform on the contract.

In early September 1994 Beatty was reinstated as president. Later that month he learned that another company, Prodigy, had CDs issued by Skinektica that were identical down to the serial number. As it turned out, Prodigy was one of the companies that Frenkel had worked with previously and had also been unable to secure a loan on them. By September 20, Beatty openly admitted the CDs were worthless based on his inability to get a loan on them.[7] In the end, the CDs, purportedly worth up to five million dollars were sold to a company in the West Indies for one dollar.

Based on these facts, the SEC filed a civil enforcement action against Beatty, Carnicle, Frenkel, Nili, and Sher. The SEC claimed that in holding out the fake Russian CDs as authentic, Beatty, Carnicle, Frenkel, and Sher committed securities fraud in violation of Section 17(a) and Rule 10b–5. The SEC also alleged that Beatty and Carnicle committed fraud by failing to inform investors that Chariot had lost the Imperial Palace lease. In addition to the allegations of fraud, the SEC claimed that Beatty, Carnicle, Frenkel, and Nili violated securities registration laws by selling unregistered Chariot stock. The SEC also alleged that Beatty and Sher are liable for aiding and abetting Chariot in record-keeping violations.

Based on these violations, the SEC now seeks to enjoin the defendants from future violations of securities laws and also seeks monetary damages in the form of civil penalties and disgorgement of profits. The SEC moved for summary judgment, and the court now grants the summary judgment motions in part and denies the motions in part.

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is proper where the evidence before the court "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[8] In applying this standard, this court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."[9] However, a dispute is only "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[10] Self-serving statements by a

7. Deposition of Robert Cord Beatty of Feb. 21, 2001, at 55–55.

8. Fed.R.Civ.P. 56(c).

9. *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1212 (10th Cir.2000) (citation omitted),

*cert. denied*, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 242 (2000).

10. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

non-moving party do not create a genuine issue of fact when the court concludes that no reasonable jury could accept those assertions in light of all the evidence before the court.[11] The Supreme Court has stated, "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." [12]

## II. Securities Fraud

The SEC claims that Beatty, Carnicle, Sher, and Frenkel committed fraud in violation of Section 17(a) of the Securities Act,[13] Section 10(b) of the Exchange Act,[14] and Rule 10b 5.[15] The elements of these claims are very similar. Section 17(a) makes it unlawful

> for any person in the offer or sale of any securities ... by the use of any means or instruments of ... communication in interstate commerce or by use of the mails ... (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or

course of business which operates or would operate as a fraud or deceit upon the purchaser.[16]

The Supreme Court has held that the SEC must show proof of scienter to establish a violation of Section 17(a)(1) but not Sections 17(a)(2) and (3).[17]

Liability under Section 10(b) and Rule 10b–5 is similar. Under Section 10(b) it is "unlawful for any person ... by the use of any means or instrumentality of interstate commerce ... [t]o use or employ, in connection with ... sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." [18] One of these rules and regulations is Rule 10b–5, which makes it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any

---

11. *See Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1482–83 (10th Cir.1995), *cert. granted*, 517 U.S. 1216, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996), *cert. denied*, 520 U.S. 1241, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997).

12. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505.

13. 15 U.S.C. § 77q(a).

14. *Id.* § 78j(b).

15. 17 C.F.R. § 240.10b–5.

16. 15 U.S.C. § 77q(a).

17. *See Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 695–96, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).

18. 15 U.S.C. § 78j(b).

person, in connection with the purchase or sale of any security.[19]

While a large body of case law has developed on what elements are required to prevail on a private Rule 10b–5 action, the Tenth Circuit has articulated different elements that the SEC must prove in an enforcement action under Rule 10b–5: "(1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) use of the jurisdictional means, [and] (4) scienter."[20]

█ In short, SEC enforcement actions rising under both Section 17(a) and Rule 10b–5 require proof of four basic elements: (1) a fraudulent act, (2) in the sale of securities, (3) perpetrated by jurisdictional means (such as the mails or telephone lines), (4) that is done with the specified mental state. The specific requirements of these elements will be discussed in more detail.

First, there must be a fraudulent act. In the context of Rule 10b–5, the act must be a material misrepresentation or omission.[21] "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock" and if it would have "significantly altered the total mix of information available" to current and potential investors.[22] Although materiality is generally a question of fact, summary judgment is proper where the omission is "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality."[23] Section 17(a) may be satisfied by a showing of one of three fraudulent acts: (1) "any device, scheme, or artifice to defraud," (2) a material misrepresentation or omission by which the defendant "obtain[ed] money or property," or (3) a "transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."[24] Second, the fraudulent act must be in the sale of any securities. The court notes a slight difference between the language of Rule 10b–5 and Section 17(a): the former requires the fraud to be perpetrated *"in connection with* the ... sale of a security,"[25] whereas the latter requires the fraud to be committed *"in* the offer or sale of any securities."[26] While the Tenth Circuit has recognized that the language of Section 17(a) might be narrower than that of Rule 10b–5,[27] no defendant in this case has argued that this distinction is dispositive to the outcome in this case. Recognizing "that section 17(a) must be given broad scope and flexible interpretation in order to encompass all the inge-

---

**19.** 17 C.F.R. § 240.10b–5.

**20.** *Geman v. S.E.C.*, 334 F.3d 1183, 1192 (10th Cir.2003) (order rearranged); 17 C.F.R. § 240.10b–5.

**21.** *Geman*, 334 F.3d at 1192; 17 C.F.R. § 240.10b–5.

**22.** *S.E.C. v. Cochran*, 214 F.3d 1261, 1267 (10th Cir.2000) (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (citing *TSC Industries, Inc.*, 426 U.S. at 449, 96 S.Ct. 2126).

**23.** *TSC Industries, Inc.*, 426 U.S. at 449, 96 S.Ct. 2126; *Cochran*, 214 F.3d at 1267.

**24.** *See* 15 U.S.C. § 77q(a).

**25.** 17 C.F.R. § 240.10b–5.

**26.** 15 U.S.C. § 77q(a).

**27.** *U.S. v. Jensen*, 608 F.2d 1349, 1354 (10th Cir.1979).

nious variations of security fraud that arise," [28] this court sees no reason to investigate further any possible difference between the language of Section 17(a) and Rule 10b–5 under the facts of this case.

The defendants' only serious contention in this regard is that the fraud must have been communicated directly to investors. This, however, is not accurate. The Tenth Circuit has expressly held that "[t]here is no requirement that the alleged violator directly communicate misrepresentations to [investors]." [29] It is enough that a person "knew or should have known that his representation would be communicated to investors." [30]

Third, the act must be perpetrated by federal "jurisdictional means," such as the mails or telephone lines. [31]

Finally, the fraud must be committed with the specified mental state. As stated above, the mental state required for a violation of Rule 10b–5 or Section 17(a)(1) is "scienter," which has been defined as "the intent to deceive, manipulate, or defraud." [32] Scienter may be established by a showing of recklessness, which is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defen-dant or is so obvious that the actor must have been aware of it." [33] Negligence is sufficient for a violation of Section 17(a)(2) or (3). [34]

The SEC basically asserts two theories by which the defendants could be liable under these anti-fraud statutes: (1) transacting on and valuing fake Russian CDs and (2) not disclosing that Chariot had lost the Imperial Palace lease. Each of these theories will be discussed in turn.

### *Fake Russian CDs*

*Fraudulent Act*

■ Beatty, Carnicle, Frenkel, and Sher all made material misrepresentations by holding the CDs out as real when, in fact, the CDs were fake. The undisputed facts demonstrate the CDs are fake.

The most damning fact is Sher's admission regarding the CDs' origin. He admits that he created the CDs on blue check paper at a Kinko's copy center in Florida and that no money was ever paid up front for the CDs—the only ostensible up-front payment was a $2 million promissory note. The fact that Sher claims he was authorized by the bank (Skinektica) to do what he did does not change the analysis. Even if Sher *was* doing just what Skinektica directed him to do, no reasonable jury

---

**28.** *Id.*

**29.** *Anixter v. Home–Stake Production Co.*, 77 F.3d 1215, 1226 (10th Cir.1996).

**30.** *Id.*

**31.** 15 U.S.C. § 77q(a) (making it unlawful to commit securities fraud "by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails"); 17 C.F.R. § 240.10b–5 (making it unlawful to commit securities fraud "by the use of any means or instrumentality of interstate commerce, or of the mails").

**32.** *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), *quoted by Anixter*, 77 F.3d at 1232.

**33.** *Anixter*, 77 F.3d at 1232–33; *Hackbart v. Holmes*, 675 F.2d 1114, 1117–18 (10th Cir. 1982).

**34.** *See Aaron*, 446 U.S. at 695–96, 100 S.Ct. 1945.

could conclude that the CDs were legitimately produced in a copy center or that an international bank would issue five million dollar CDs without cash up front.

The declaration of Andrey Koslov, Deputy Chairman and Chair of the Securities Division of the Central Bank of the Russian Federation, confirms the fraudulent nature of the CDs. Mr. Koslov states a number of reasons why these CDs failed to comply with Russian law and, therefore, could not be legitimate. The CDs did not contain an unconditional commitment by the bank to return the amount on deposit, nor do the CDs indicate the address of the beneficiary. The CDs did not state the amount of interest to be paid to the depositor, nor did they contain the issuer's seal, confirming the signature of the authorized officials. Furthermore, the CDs were issued in United States dollars rather than rubles as required by Russian law. Finally, the CDs were issued to legal entities that were not registered within the territory of the Russian Federation. All of these defects violate Russian law and, therefore, demonstrate the CDs were fake.

A number of other undisputed facts confirm that the CDs were fake. First, the CDs at issue in this case had serial numbers identical to Skinektica CDs held by another company called Prodigy. Second, Frenkel and Sher limited Chariot's ability to loan on the CDs, an unusual restriction for a transaction of this nature. Whatever the legal effects of the March 23, 1994, agreement, as a matter of fact, Beatty could not obtain loans based on the CDs,

which suggests they were worthless. Finally, the CDs purportedly worth $5 million after maturity were sold to a company in the British West Indies for one dollar, apparently at the SEC's urging that Chariot "voluntarily cease and desist from representing to the public that the certificates are of any actual value." [35]

Since undisputed facts demonstrate that the CDs were fake, it follows that any statement as to their authenticity was a material misrepresentation. The CDs listed on Chariot's financial statements and SEC filings as being worth $3,753,212, approximately one third of the company's total assets.[36] Without this asset on its books, Chariot would have been delisted from NASDAQ, a fact that would have necessarily affected potential investors' decisions—and even their legal ability—"to buy or sell stock."[37] The validity of an asset worth 30% of the total value of all assets is "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality."[38] Accordingly, this court finds that in claiming the CDs were legitimate, Beatty, Carnicle, Frenkel, and Sher, made material misrepresentations under Rule 10b–5 and employed a "device . . . or artifice to defraud" under Section 17(a).

*Offer or Sale of Securities*

It is undisputed that the misrepresentations as to the value and authenticity of the Russian stock were made in the offer or sale of Chariot stock. This element is easily satisfied in the case of Beatty, who

---

**35.** *See* SEC Form 8–K of July 13, 1995.

**36.** *See* Form 10–Q of Chariot Entertainment, Inc., of March 31, 1994, at 3.

**37.** *Cochran,* 214 F.3d at 1267 (citing *TSC Industries, Inc.,* 426 U.S. at 449, 96 S.Ct. 2126); *Grossman,* 120 F.3d at 1119 (citing

*TSC Industries, Inc.,* 426 U.S. at 449, 96 S.Ct. 2126).

**38.** *TSC Industries, Inc.,* 426 U.S. at 449, 96 S.Ct. 2126; *Cochran,* 214 F.3d at 1267.

had the CDs included on SEC filings that would be relied upon by investors.

Sher contends that Rule 10b–5 and Section 17(a) cannot apply to him since he never made any statements to investors. Presumably similar reasoning would apply to Frenkel and Carnicle as well. However, it is undisputed that all defendants understood the CDs were being acquired to allow Chariot to maintain a NASDAQ listing in order to sell shares on the public market. Carnicle clearly knew this fact since he orchestrated the entire deal. Sher stated repeatedly that he understood the CDs were acquired for "asset enhancement" purposes. When asked what he meant by that he stated that Chariot was acquiring the CDs because "they want to trade public[ly]," that "[t]he company must have something behind them," and that without this asset, Chariot could not maintain a listing on NASDAQ.[39] Frenkel also stated he knew the CDs were being acquired for "asset enhancement" to allow Chariot to go public through its merger with Eagle.[40] As discussed above, since Frenkel brokered the deal between Chariot and Sher, Sher could only have arrived at a correct understanding of Chariot's purposes if he had learned that from Sher.

Thus, there is no dispute that all defendants knew that the CDs were being acquired to allow Chariot to trade on the public market. The implication of this knowledge is that all defendants knew or should have known that their representations as to the value and authenticity of the CDs would be communicated to investors.[41]

### Jurisdictional Means

The SEC has alleged that the defendants exchanged numerous phone calls and letters about the Russian CDs, and no defendant disputes that the federal jurisdictional requirement is satisfied.

### Mental State

Since the CDs were undeniably fake, and since all defendants held them out as authentic, liability turns on whether each defendant knew the CDs were fake or was reckless with respect to that fact at the time they made representations as to the value or authenticity of the CDs. It is important to consider each defendant individually.

*Sher.* Although Sher claims he was ignorant as to the true worth of the CDs, there can be no genuine dispute that Sher knew the CDs were fake. As discussed above, Sher knew why Chariot wanted the stocks. As representative of Skinektica in the United States, he played an integral role in the exchange of Skinektica CDs for Chariot shares. Because there was no cash up front, the CDs—which would be issued to companies controlled by Frenkel—would be paid for with proceeds from the sale of Chariot stock. Sher claims that the CDs were authorized by Skinektica in exchange for a promissory note from a company called Atlantic Bankcorp, which he controlled, for somewhere between $1.5 and $2 million (different figures exist). Instead of issuing the certificates itself, Skinektica purportedly assigned numbers to the CDs and gave Sher a model certificate that he could follow. Sher literally made

---

**39.** *See* Testimony of Hillel Sher of Nov. 22, 1994, at 271.

**40.** Testimony of Robert Cord Beatty of Nov. 18, 1994, at 57–58.

**41.** *See Anixter,* 77 F.3d at 1226.

the CDs himself by photocopying them on blue check paper at a Kinko's in Florida, and then the CDs were signed by Skinektica Vice President Bukhanova. In response to deposition questions about legal irregularities, Sher only defends that he was authorized to do what he did and assumed that if the bank told him to do something, it was okay for him to do it.

While this court recognizes its obligation to view all facts in a light most favorable to the non-moving party,[42] the court finds that no reasonable jury could believe Sher did not know the CDs were fake. Sher is asking a jury to believe that he thought CDs worth millions of dollars were authorized without an up-front cash deposit. Sher further asks a jury to believe that an international bank would issue such CDs on paper purchased and printed at Kinko's.

Moreover, it is undisputed that Prodigy, another U.S. company, had CDs identical to Chariot's, even down to the serial number. Like Chariot's, Prodigy's Skinektica CDs were worthless. Sher admits that he and Frenkel worked with Prodigy in the past. Since Sher claims to be the only authorized representative of Skinektica in the U.S., the necessary conclusion is that Sher was aware that identical CDs went to Prodigy.

Sher also admits he knew the issuance of CDs was inconsistent with Russian law.[43] His only explanation is that he thought the bank had authorization to issue the CDs in the manner they did,[44] in other words, that the bank perpetrated the fraud. However, Sher has offered no evidence other than his own self-serving testimony that the bank was the source of the fraud. Moreover, even this testimony is contradicted by Sher's admission that the bank was critical of his behavior in the United States, criticizing him for repeatedly entering into "air transactions," transactions that moved numbers but no money.[45]

Sher's story is further discredited by his statement that issuing the CDs posed no risk to either him or to Skinektica.[46] It is unreasonable to accept that a international transaction based on the sale of shares in a company that did not yet exist posed no risk to Skinektica.

In light of these undisputed facts, a strong argument can be made that no reasonable jury could find that Sher did not know the CDs he was photocopying were fake. However, the court need not find that Sher had actual knowledge that the CDs were fake because his conduct was, at a minimum, "an extreme departure from the standards of ordinary care, and which … a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[47] Thus, summary judgment is appropriate for the SEC against Sher.

*Frenkel.* While Sher's scienter is established largely by his unique role as fabricator of the CDs, Frenkel's scienter is established by his knowledge of the transaction.

---

42. See *Koch*, 203 F.3d at 1212.

43. Deposition of Hillel Sher of March 1, 2001, at 51.

44. *Id.* at 51–52.

45. Testimony of Hillel Sher of Nov. 22, 1994, at 254.

46. *Id.* at 218.

47. *Anixter*, 77 F.3d at 1232–33; *Hackbart*, 675 F.2d at 1117–18.

Frenkel admits that from the outset, he knew that Chariot wanted the CDs to raise capital, loaning money based on its assets. However, the deal Frenkel was setting up would not allow Chariot to loan on the CDs. When Beatty approached Frenkel in July 1994 to ask why he could not get a loan, Frenkel responded that Chariot was prohibited from securing a loan on the CDs under the March 23, 1994, agreement.[48] Unlike Beatty, whose discovery of the true meaning of the agreement was triggered by his failure to get a loan, Frenkel gives no reason for the court to conclude that he did not realize the significance of the contract terms from the beginning. Thus, it is undisputed that Frenkel knowingly brokered a deal for CDs that could not be used for the very purpose they were sought.

While Sher's intimate awareness of the CDs provenance cannot be imputed to Frenkel without more evidence, Frenkel's own understanding of the transaction makes it clear that the only way he could not have known the CDs were fake was if he recklessly disregarded that fact. It is undisputed that the CDs were ostensibly issued to Frenkel's company, F & P, and that F & P would receive Chariot shares in exchange for those CDs. Unlike the other defendants—who claim the CDs would be paid for with proceeds from the shares, a claim more consistent with what actually happened in this case—Frenkel claims that the shares themselves would be transferred to Skinektica and that payment would come through the increased value of the shares.[49] Similar to Sher, Frenkel would have a jury believe that an interna-

tional bank would issue multi-million dollar CDs on the promise of receiving stock in a U.S. corporation that did not exist at the time the CDs were issued. This claim demonstrates "an extreme departure from the standards of ordinary care" and "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[50] No reasonable jury could find that Frenkel could have been ignorant of the true value of the CDs other than by wilful blindness.

In addition to this undisputed circumstantial evidence of Frenkel's scienter, the SEC has also established a clear profit motive for Frenkel to participate in the scheme. As will be discussed below, Frenkel directly profited by getting unregistered Chariot shares that could be cashed out quickly. Thus, while Skinektica faced the reality that Chariot stock might not thrive in the long run, Frenkel did not run that risk since he could easily dispose of his unregistered shares for a profit. Accordingly, this court finds that Frenkel acted with scienter, and summary judgment is appropriate for the SEC against him as well.

*Carnicle.* The SEC Memorandum in Support of Summary Judgment Against Defendant Michael Carnicle recites a number of facts that would support summary judgment against him if they were true. However, the SEC is unable to directly support those assertions with citations to the record. While it is true he set up the deal and certainly had *opportunity* to know what the SEC claims he knew, it is

---

**48.** Testimony of Robert Cord Beatty of November 18, 1994, at 57–58.

**49.** Deposition of Amotz Frenkel of Feb. 13, 2001, at 18, 20.

**50.** *Anixter,* 77 F.3d at 1232–33; *Hackbart,* 675 F.2d at 1117–18.

not illegal to attempt to secure assets, rearrange corporations, and issue stock. Nothing in the record unequivocally indicates he actually had the guilty knowledge the SEC imputes to him.

However, the dearth of evidence regarding Carnicle's role and interest in the project was caused by his repeatedly invoking the Fifth Amendment when questioned about his involvement with Chariot. Since this is a civil proceeding, the court is entitled to draw an adverse inference based on Carnicle's invoking the Fifth Amendment.[51] While there is no direct evidence that Carnicle shared Frenkel and Sher's incriminating knowledge that the Russian bank would be compensated with either the Chariot stock itself or proceeds therefrom, the scope of the scheme, the fact that he participated so extensively in the deal but simultaneously excluded Beatty from negotiations, and the fact that he pled the Fifth Amendment in response to examination on these topics all support the conclusion that Carnicle knew exactly what was going on—or at least recklessly disregarded the reality of the situation. In the absence of evidence supporting any other conclusion, the court finds the SEC is entitled to summary judgment against Carnicle.

*Beatty.* Although Beatty admits that he ultimately learned the CDs were worthless, his state of mind before March 31, 1994 (when Chariot's Form 10–Q was filed with the SEC) and April 5, 1994 (when Chariot filed Form S8 with the SEC) is disputed. Summary judgment as to him, therefore, is not proper.

While the other defendants' scienter is established largely through their knowledge of the transaction, this chain of reasoning does not work for Beatty. Beatty claims that Carnicle handled negotiations by himself and that Carnicle put the deal together on his own. Unlike Carnicle, Frenkel, and Sher, who each knew the Chariot stock was intended to compensate Skinektica, there is a genuine dispute as to whether Beatty shared this knowledge. From Beatty's perspective, Chariot was purchasing the CDs from F & P, not Skinektica, so he was unaware of the details Sher and Frenkel had worked out to pay the bank. Accordingly, viewing the facts in the light most favorable to Beatty, from his perspective valuable consideration was given in the form of an interest in the newly formed company.

Because of Beatty's position as president of Chariot, the SEC also claims that even if Beatty did not have actual knowledge that the CDs were fake, he acted recklessly by not verifying the CDs' authenticity before the merger. However, viewing the facts in the light most favorable to Beatty, this court must find that he did a number of things to verify the CDs' authenticity and was, therefore, not reckless. He had the CDs authenticated prior to March 23, 1994 by Duane Midgley, a certified public accountant. Sometime in March, before Form 10–Q was filed, Beatty also hired Judith Jarvis of Broad and Cassel, a Florida law firm, to represent Chariot in securities matters. Additionally, the merger agreement was drawn up by Karl Mangum, an attorney, and reviewed by Nathan Drage, Chariot counsel who was also experienced in securities. Given these efforts to ascertain the validity of the CDs, this court cannot conclude that Beatty's efforts prior to the merger were "an extreme departure from the standards

---

**51.** *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

of ordinary care." [52]

In addition to these arguments, the SEC claims that Beatty knew or was reckless with regard to the fact that the CDs could not be used to obtain credit because the March 23, 1994, agreement limited Chariot's ability to get loans based on the CDs. Beatty, however, claims that he was unaware of the significance of the contract terms until July 1994. On Beatty's version of the facts, he was frustrated by Chariot's inability to secure loans on the CDs. In July 1994 he approached Frenkel about that reality and was informed that under the March 23 agreement, Chariot did not have the right to take out loans on the CDs. Beatty was surprised by this fact and quickly sought a legal opinion from Mr. Drage. Mr. Drage was also apparently surprised by what he saw in the agreement but confirmed Frenkel's understanding: Chariot could not loan or pledge the CDs. Because Drage, a licensed attorney, did not realize the significance of the contract terms prior to the March 23 agreement, this court cannot find that Beatty was reckless as to the agreement's meaning. If a licensed attorney missed that point, this court cannot conclude that Beatty, who claims he relied on his attorney's advice in entering the agreement, was reckless. Thus, this court concludes that summary judgment is not proper as to Beatty since there is genuine dispute as to his understanding of the CDs both on March 31, 1994, when Form 10–Q was filed, and on April 5, 1994, when Form S8 was filed.

Nevertheless, it is undisputed that by mid-July, when Beatty met with Frenkel, Beatty knew the CDs were worthless.

Also, in September Beatty learned that another company, Prodigy, had identical certificates and also had been unable to secure a loan. Beatty admits on September 20, 1994, he publicly stated that the CDs were worthless. The SEC argues that these facts establish Beatty's scienter.

The problem with finding liability based on these facts is that they happened after the misrepresentations made in the SEC filings. While these facts establish that Beatty ultimately knew the CDs were fake, the SEC has not alleged that Beatty made any representations after he gained this knowledge. Because the SEC has not established that Beatty acted with scienter when he authorized Chariot's SEC filings, summary judgment is denied with regard to those filings.

However, the court recognizes that these facts might establish liability on another theory. Although he was removed as president in May 1994, Beatty was reinstated as president in early September. Chariot stayed public until October 1994, when it was delisted, and shares continued to be traded until then. Beatty continued as president until sometime in October 1994. Thus, it is undisputed that by the end of September 1994, Beatty (1) had made an earlier statement of the CDs value, (2) knew the CDs were worthless, and (3) was simultaneously president of Chariot. The fact that he was president may have imposed some duty on him to correct his earlier misrepresentations. If this is the case, then Beatty's failure to notify shareholders in September could be a material omission for which he would be liable under Rule 10b–5 and Section 17(a).[53] If the SEC can establish that

---

**52.** *Anixter,* 77 F.3d at 1232–33; *Hackbart,* 675 F.2d at 1117–18.

**53.** *See Geman,* 334 F.3d at 1192 (stating that a material misrepresentation may be estab-

Beatty had a duty to disclose the true value of the shares once he was reinstated as president, it may file a new motion for summary judgment on those facts before the deadline for dispositive motions.

### *Lost Imperial Palace Lease*

■ In addition to fraud based on the fake Russian CDs, the SEC alleges that Beatty and Frenkel committed fraud when they failed to inform investors about the status of the Imperial Palace lease. It is undisputed that on March 9, 1994, Chariot issued a press release announcing the merger and plans to perform shows at Imperial Palace. It is also undisputed that on May 24, 1994, Chariot issued another press release announcing that Quadara was president and Beatty is VP and that company had rights to perform Gladiators show in Las Vegas. Neither of these press releases made any mention of the status of Chariot's agreement with the Imperial Palace. However, because the materiality of this omission is in question, summary judgment is denied on this claim.

There is no dispute that these press releases were issued to attract investors, so this court finds that the press releases were made in connection with the offer or sale of securities. Also, since the press releases were circulated nationally, neither Beatty nor Carnicle disputes that telephone lines or mail were used.

Other facts, however, are in dispute. First, there is dispute as to whether the lease was actually lost at the time Chariot issued the press releases. The clearest indication that Chariot lost the lease was a letter sent on August 26, 1994, some time

after the latter press release was issued. Before this time, the relationship between Chariot and the Imperial Palace was in flux as Chariot tried to secure the necessary funds. Although the SEC claims that Chariot knew as early as February that the lease was in trouble, it offers no evidence to support this claim. This court cannot find that the press releases omitted a reference to the uncertain lease without evidence that the lease was actually in trouble when the press releases were issued.

Second, the materiality of this omission is in dispute. The SEC argues that the omission was material since Ferraro only secured rights to produce the show at the Imperial Palace. The court agrees that if the rights were, in fact, limited to the Imperial Palace, an omission of that fact would be material. However, contrary to the SEC's assertions, the licensing agreement between Goldwyn and Ferraro arguably imposed no such limit. The only limit this court can find was that the show would be performed "at a fixed facility in Las Vegas, Nevada."[54] Without further evidence to the contrary, this court understands that term to mean that the show would not be a traveling show but does not understand that the identity of the venue was necessarily fixed. Thus, even if Chariot had lost the Imperial Palace lease, it could have secured another permanent location for the show. While a jury could find this information was material, given that another venue could be secured, the lost lease was not "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality."[55]

Finally, there is some dispute as to who knew what about the lease. Beatty con-

---

lished by an "omission where there is a duty to speak").

**54.** Letter from Laurence M. Marks to David Berson of July 9, 1993, at 1.

**55.** *TSC Industries, Inc.,* 426 U.S. at 449, 96

tends that Carnicle fielded all concerns from the Imperial Palace regarding the lease. Beatty claims that Carnicle reassured him repeatedly that all was well with the lease. While such statements tend to inculpate Carnicle, they are enough to leave it to a jury to determine whether Beatty knew what was going on.

Accordingly, summary judgment as to fraud claims rising out of the omission of the lost Imperial Palace lease is denied as to all defendants.

### III. Section 5 Claims

■ The SEC also claims that Beatty, Carnicle, Amotz Frenkel, and Nili Frenkel violated Sections 5(a) and (c) of the 1933 Securities Act. In general, Section 5 makes it unlawful to sell unregistered securities.[56] The elements of a Section 5 claim are "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." [57]

Nevertheless, certain transactions are not subject to Section 5's registration requirement. For example, "Regulation S" exempts "offers and sales that occur outside the United States" from the registration requirements.[58] The sale of securities by an issuer is deemed to have occurred outside the United States if (1) it is an "offshore transaction"; (2) there are "no directed selling efforts" made in the United States; and (3) the sale satisfies a number of other complicated requirements.[59] An "offshore transaction" must satisfy two requirements: the offer is "not made to a person in the United States," and the seller must "reasonably believe that the buyer is outside the United States." [60] "Directed selling efforts" are "any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for any of the securities being offered in reliance on this Regulation S." [61] A sale by someone other than an issuer is deemed to have occurred outside the United States in essentially the same way: (1) there must be an "offshore transaction"; (2) there may be no "directed selling efforts" in the United States; and (3) the transaction must comply with another set of complicated conditions.[62]

■ Although securities issued under Regulation S are exempt from the registration requirement, once the SEC has established a prima facie case for a Section 5 violation, the burden of proof shifts back to the defendant to establish that he has satisfied the requirements of the exemption.[63] Furthermore, Regulation S does

---

S.Ct. 2126; *Cochran*, 214 F.3d at 1267.

**56.** *See* 15 U.S.C. § 77e(a), (c).

**57.** *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n. 4 (2nd Cir.1998), *cert. denied*, 525 U.S. 1139, 119 S.Ct. 1029, 143 L.Ed.2d 39 (1999).

**58.** *See Sterlin v. Biomune Systems*, 154 F.3d 1191, 1193 n. 2 (10th Cir.1998); 17 C.F.R. § 230.901.

**59.** 17 C.F.R. § 230.903.

**60.** *Id.* § 230.902(h)(1)(i).

**61.** *Id.* § 230.902(c)(1).

**62.** *Id.* § 230.904(a).

**63.** *See Securities and Exchange Commission v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *see also SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 859 (S.D.N.Y.1997).

not exempt securities that are issued as "part of a plan to evade the registration provisions of the Securities Act." [64]

▮ In the context of this case, summary judgment is granted on the Section 5 claims against Carnicle, Frenkel, and Nili, but it is denied as to the claims against Beatty. No one disputes that the 714,285 shares Chariot stock purportedly issued pursuant to Regulation S were unregistered. Frenkel's involvement in the transfer is unclear. Because he was not affiliated with the issuers, he cannot be liable for the original sale. However, the shares were ostensibly issued to F & P, and they ultimately ended up in his wife's hands. In the absence of any contrary evidence, the only reasonable conclusion is that Frenkel, through F & P, arranged the sale of shares from Yocheved Datner to his wife Nili. It is undisputed that Nili then sold the stock to third parties. No one claims that either the sale to Nili or the sale by Nili to a third party were offshore transactions, so Regulation S does not apply to these transactions. Thus, summary judgment is proper for the SEC against Frenkel and Nili on the Section 5 claim.

▮ On the other hand, establishing liability for Beatty and Carnicle is not so straightforward. The SEC claims that this sale of stock, though ostensibly to a foreign national, was in reality a back-door sale to F & P. As such, the SEC contends that the sale is not protected by Regulation S, either because the sale did not fall within Regulation S or because if it did fall within Regulation S, the sale was part of a plan to evade the registration requirement and therefore not protected by Regulation S.

When viewed in a light most favorable to the defendants, the issuance arguably met the technical requirements of Regulation S. Neither party briefed in any detail the requirements of Regulation S. Both in the briefs and in arguments, the parties dwelt on the issue of whether the stock was issued to a foreign national or to F & P. However, it is undisputed that the stock was initially issued to Yocheved Datner, a purported Israeli citizen. Furthermore, a letter from Judith Jarvis, securities counsel for Chariot, suggests the securities were issued under regulation S.[65] The SEC has provided no evidence that the issuance did not comply with the technicalities of regulation SEC, and viewing the evidence in a light most favorable to the defendants, this court must conclude that there is a factual question of whether the sale of stock to Yocheved Datner complied with Regulation S.

Still, the SEC argues that Regulation S will not protect the transaction since the sale was done solely to avoid the registration requirements. Frenkel states that these shares were issued pursuant to Regulation S because these shares could be cashed out quickly.[66] The shares would be issued to Ms. Datner, who would then sell them to Nili Frenkel.[67] It is clear from these facts that the shares were intended to end up with Frenkel and that the sale to Ms. Datner was done to avoid the registration requirements. The undisputed testimony is that Carnicle masterminded this

---

**64.** *See Softpoint, Inc.,* 958 F.Supp. at 861 (S.D.N.Y.1997); 17 C.F.R. § 230.901 n. 2.

**65.** Letter from Judith Jarvis to Kurt Hughes of May 20, 1994, at 1.

**66.** Deposition of Amotz Frenkel of Feb. 13, 2001, at 20.

**67.** *Id.* at 22.

plan, so summary judgment is proper for the SEC against Carnicle.

■ On the other hand, viewing the facts in a light favorable to defendants, this court cannot conclude that Beatty knew of the plan. Although he admits that he later learned why the shares were issued pursuant to Regulation S, at the time he was unaware of Carnicle's motive for doing so. The court is unaware of any fact that ties Beatty to the attempt to let Frenkel cash out the shares. Although the SEC fervently argued that Section 5 does not have a scienter requirement, under the facts of this case, the SEC can only establish that Beatty was "part of a plan" if he was aware of the larger fraud. Accordingly, summary judgment against Beatty is denied.

## IV. Injunctions Against Future Violations of Federal Securities Laws

Based on the above findings, the court also concludes that Carnicle, Sher, and Frenkel should be enjoined from future violations of federal securities laws, specifically Section 17(a), Section 10, and Rule 10b–5. Carnicle and Frenkel are also enjoined from future violations of Section 5.

■ The SEC is authorized to seek an injunction on anyone who "is engaged or about to engage in" violations of federal securities laws.[68] "An injunction based on the violation of securities laws is appropriate if the SEC demonstrates a reasonable and substantial likelihood that the defendant, if not enjoined, will violate se-

curities laws in the future."[69] To determine whether future violations are proper, this court should consider several factors: "the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations, and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations."[70] Of these factors, the degree of scienter is particularly weighty.[71]

■ Because the SEC has only established liability as to Carnicle, Sher, Frenkel, and Nili, the court does not consider whether an injunction is appropriate as to Beatty. As to Carnicle, Frenkel, and Sher, an injunction is proper. The violation at issue here was quite serious: the fabrication of CDs purportedly worth five million dollars. Each defendant perpetrated the fraud with scienter. Rather than take responsibility for their violations, they instead have tried to mask their involvement in the scheme. The various criminal actions against Carnicle and the evidence that Frenkel and Sher worked together to defraud other businesses, such as Prodigy, suggest that case involved no momentary lapse in judgment but a premeditated and orchestrated scheme. Accordingly, Carnicle, Frenkel, and Sher are enjoined from further violating the antifraud provisions of federal securities laws.

■ Although the SEC prevailed in its claims against Nili, because that offense did not require a showing of scienter, and because the SEC has not given any reason why she is likely to violate securities laws

---

**68.** 15 U.S.C. §§ 77t(b), 78u(d)(1).

**69.** *SEC v. Pros Intern., Inc.*, 994 F.2d 767, 769 (10th Cir.1993).

**70.** *Id.*

**71.** *See Id.; Securities and Exchange Commission v. Haswell*, 654 F.2d 698, 699 (10th Cir. 1981).

in the future, the injunction against Nili is denied without prejudice. Should the SEC wish to pursue the matter further, it is invited to brief the issue of whether Nili is likely to violate antifraud provisions in the future by filing a motion to that effect within 30 days of this order.

## V. Civil Penalties

■ Because this court finds Frenkel, Carnicle, and Sher violated securities antifraud statutes, causing substantial loss to others, it finds that civil penalties are also appropriate. In addition to the equitable remedy discussed above, the SEC has authority to seek civil penalties up to $100,000 where (1) the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (2) the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." [72]

The violations in this case merit such penalties. Fabricating and selling the fake Russian CDs was indisputably an act of fraud or deceit. With such a high price tag, the fraud would inevitably cause substantial losses. In this case, the fact that Chariot's primary asset turned out to be fake caused the company to fold, which in turn caused substantial losses to shareholders and to all who had invested time and money in the corporation.

Having granted summary judgment as to the claims for civil penalties, the court now invites further briefing as to what amount the penalties should be on the schedule outlined below.

## VI. Disgorgement

■ In addition to the penalties discussed above, the SEC seeks an order that Frenkel, Nili, and Carnicle disgorge any profits received for violating securities laws. Because Frenkel, Nili, and Carnicle all profited from their violations of securities laws, summary judgment is appropriate as to these claims, which are awarded with prejudgment interest.

■ This court has equitable powers to order violators of federal securities laws "to disgorge their fraudulently obtained profits." [73] Under those equitable powers, the court "has broad discretion ... in calculating the amount to be disgorged. The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation,' ∴ 'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.' " [74] The most significant factor in awarding prejudgment interest is the remedial purpose to be served by the securities laws,[75] recognizing that requiring interest avoids "what amounts to an interest free loan procured as a result of illegal activity." [76]

It is unclear from the evidence before the court that Frenkel profited from his violations. The SEC seems to lump him in

---

**72.** 15 U.S.C. §§ 77t(d)(2)(c), 78u(d)(3)(B)(iii).

**73.** *S.E.C. v. Fischbach Corp.,* 133 F.3d 170, 175 (2nd Cir.1997); *Securities and Exchange Commission v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1104 (2nd Cir.1972).

**74.** *S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1474–75 (2nd Cir.1996), *cert. de-*

*nied,* 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997).

**75.** *Id.* at 1476.

**76.** *See SEC v. Moran,* 944 F.Supp. 286, 295 (S.D.N.Y.1996).

with his wife but gives no reason for doing so. In fact, in its brief the SEC suggests that Nili's profit reflects the amount that both Frenkels profited. Accordingly, the motion for summary judgment as to disgorgement by Frenkel is denied.

It is, however, undisputed that Nili sold the shares she received for $111,372. It is unclear from the record whether this figure is her net profit or simply the value of the shares she sold. However, there is no evidence that she paid anything for the shares she received, so this court accepts this amount as her net profit. The SEC also asks for $228,641 as prejudgment interest.

Carnicle profited by having Chariot issue stock to two of his associates, ostensibly as compensation they had done for Chariot. Neither had done any work for Chariot, and the shares issued to them were ultimately transferred to an account controlled by Carnicle or to his creditors. The SEC claims that he profited to the extent of $183,186 and seeks prejudgment interest worth $197,294.

While neither Nili nor Carnicle has opposed these amounts, the court is concerned that the prejudgment interest awards are too high and would like to review the SEC's calculations of interest before awarding prejudgment interest. Accordingly, the court directs Nili and Carnicle to disgorge any wrongful profits from the sale of Chariot stock. The SEC is directed to submit further briefing as to how it calculated interest on these gains on the schedule outlined below.

### VII. Injunction Against Beatty Serving as Corporate Officer

The SEC contends that Beatty should be permanently barred from serving as

officer or director of any public company. Because the SEC has not established that Beatty violated any securities laws, summary judgment is denied at this time.

### VIII. Liability for Aiding and Abetting in Chariot's Record–Keeping Violation

The SEC claims that summary judgment is proper against Beatty, Sher, and Carnicle for aiding and abetting in Chariot's violations of Section 13(b)(2)(A). Because liability under this theory turns on scienter, summary judgment is denied as to Beatty but granted as to Sher and Carnicle.

██ Federal law requires companies that file reports with the Commission to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." [77] Plaintiff cites *Graham v. SEC*[78] —which was decided in the context of Rule 10b–5—for the elements of establishing aiding and abetting liability under federal securities law. Under *Graham,* the SEC must establish three elements: "(1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter'—i.e., that she rendered such assistance knowingly or recklessly." [79] The SEC in its Memorandum in Support of Summary Judgment interprets this third requirement to call for "a general awareness by the aider and abettor that his role is part of an overall activity that was improper." While this interpretation

---

**77.** 15 U.S.C. § 78m(b)(2)(A).

**78.** 222 F.3d 994 (D.C.Cir.2000).

**79.** *Id.* at 1000.

of the third element is questionable, this court finds that to prevail on this claim, the SEC must establish knowledge or reckless disregard of the fact that the defendant was aiding or abetting a violation of securities law.

 The only bookkeeping violation established by the SEC is Chariot's inclusion of the fake CDs on its SEC filings in March and April. It is undisputed that both Sher and Beatty substantially assisted Chariot in cooking the books. However, as discussed above, the SEC has not established that Beatty knew or recklessly disregarded the fact that the CDs were fake. On the other hand, since Sher knew or recklessly disregarded the fact that the CDs were fake, and since he knew that the CDs would be recorded as an asset on Chariot's books, summary judgment is appropriate as to him on this claim.

The SEC also claims that Beatty misled Chariot's independent auditor by omitting the details of how Chariot acquired the CDs. Because the SEC has not established that Beatty omitted such details, summary judgment is denied on this claim. Rule 13b–2 makes it illegal for an officer to mislead auditors and accountants.[80] Although the text of the regulation says nothing about a required mental element, the anti-fraud policies behind federal securities law suggest that this enforcement of this rule requires intent to mislead or recklessness. The SEC has articulated no legal basis for finding that scienter is not required to prevail under this rule, and in every opinion this court found that considered 17 C.F.R. § 240.13b2–2, the violation was knowing or reckless.[81]

The SEC alleges that Beatty did not fully disclose the details of the CD acquisition when seeking an independent auditor's opinion of the CDs. However, nothing beyond the SEC's bare allegation supports this assertion—the SEC cites no record evidence for the proposition that Beatty did not disclose all material information to the auditor. It is undisputed that an audit was done, and without some fact that suggests that Beatty misled the auditor in seeking his opinion, this court cannot conclude that, as a matter of law, Beatty violated Rule 13b–2. Without even reaching the question of whether omitting these details would be material, this court finds that the SEC must offer some evidence of an omission before Beatty is required to offer proof that he actually informed the auditor of all the details of the transaction. If the SEC intends to pursue summary judgment on this matter, it is directed to file a new motion.

## CONCLUSION

Based on this analysis, the motions for summary judgment (56–1, 96–1) are granted in part and denied in part as follows:

1. Summary judgment that Sher, Frenkel, Carnicle, and Beatty violated Section 17(a), Section 10(b), and Rule 10b–5:

 a) GRANTED as to Sher, Frenkel, and Carnicle;

 b) DENIED without prejudice as to Beatty. Any subsequent motions for summary judgment should be filed before the dispositive motions cutoff of April 30, 2004.

---

**80.** *See* 17 C.F.R. § 240.13b2–2.

**81.** *See, e.g., U.S. v. Bradstreet,* 135 F.3d 46 (1st Cir.1998), *cert. denied,* 523 U.S. 1122, 118

S.Ct. 1805, 140 L.Ed.2d 944 (1998); *SEC v. Solucorp Industries, Ltd.,* 274 F.Supp.2d 379, 420–21 (S.D.N.Y.2003).

2. Summary judgment that Beatty, Carnicle, Frenkel, and Nili violated Section 5:

 a) GRANTED as to Carnicle, Frenkel, and Nili;

 b) DENIED without prejudice as to Beatty.

3. Summary judgment that Beatty, Carnicle, Frenkel, Sher, and Nili should be enjoined from future violations of securities laws:

 a) GRANTED as to Carnicle, Frenkel, and Sher;

 b) DENIED without prejudice as to Beatty and Nili.

4. Summary judgment that Carnicle, Frenkel, and Nili should disgorge ill-gotten gains with prejudgment interest.

 a) GRANTED as to Carnicle and Nili. The SEC has thirty days from the date of this order to brief the court as to the amount of prejudgment interest that should be awarded. Defendants will have thirty days to respond. The SEC will have twenty one days to reply.

 b) DENIED as to Frenkel.

5. Summary judgment that civil penalties should be assessed against Carnicle, Frenkel, and Sher:

 a) GRANTED. The SEC has thirty days from the date of this order to brief the court as to the appropriate amount of penalties. Defendants have thirty days to respond. The SEC will have twenty one days to reply.

6. Injunction that Beatty may never serve as officer of a public company:

 a) DENIED without prejudice.

7. Aiding and abetting liability for Chariot's bookkeeping violations:

 a) GRANTED as to Carnicle, Frenkel, and Sher;

 b) DENIED without prejudice as to Beatty.

SO ORDERED.